**BOARD OF EDUCATION OF COMMUNITY HIGH SCHOOL DISTRICT 218, Plaintiff,**

v.

**ILLINOIS STATE BOARD OF EDUCATION; Joseph A. Spagnolo, in his official capacity as Illinois State Superintendent of Education; Illinois Department of Human Services; Howard A. Peters III, in his official capacity as Secretary of the Department of Human Services; Mr. and Mrs. B., individually and as parents and next friends of J.B., Defendants.**

No. 95 C 5705.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 3, 1997.

Order Denying Reconsideration,
Sept. 24, 1997.

Jon Gardner Crawford, Andrew Charles Eulass, Scariano, Kula, Ellch & Himes, Chtd., Chicago, IL, for plaintiff Community High School Dist. 218 Bd. of Educ.

Robert Shorey Graettinger, Illinois Attorney General's Office, Chicago, IL, for defendants Illinois State Bd. of Educ., Joseph A. Spagnolo, Illinois Dept. of Mental Health & Developmental Disabilities, Anna Patla.

Deborah W. Owens, Hinsdale, IL, for defendants Mr. & Mrs. B.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

Plaintiff Community High School District 218 filed a five count complaint against the Illinois State Board of Education ("ISBE") and the Illinois Department of Human Services [1] ("DHS") (collectively "Agency Defendants"); Joseph A. Spagnolo, in his official capacity as Illinois State Superintendent of Education, and Howard A. Peters III, in his official capacity as Secretary of DHS [2] (collectively "Director Defendants"); and Mr. and Mrs. B., the parents of J.B. ("Parent Defendants"). The complaint is brought under the Individuals with Disabilities Education Act ("IDEA"), P.L. 105–17 (*eff.* June 4, 1997), section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1997), and the School Code of Illinois, 105 ILCS 5/14–8.02(j) (1997). For the reasons set forth below, the court hereby grants summary judgment *sua*

*sponte* in favor of Agency and Director Defendants on counts II through IV of the complaint.

## I. Factual and Procedural Background

This action concerns the proper educational placement for J.B., a student with a history of severe psychiatric and behavioral disabilities. In December of 1992, J.B.'s parents applied for an Individual Care Grant ("ICG") from defendant DHS to place their son in a twenty-four hour residential care facility. 20 ILCS 1705/7.1 (1997), 59 IL ADC § 135.40 (1997). Their application was denied by an ICG eligibility determination panel and later by a director's level appeal board in accordance with the procedures set forth in 59 IL ADC § 135.50(h). After the appeal was denied, J.B.'s parents unilaterally placed their son in a twenty-four hour residential care facility in Pennsylvania known as Kid's Peace.

As J.B.'s parents awaited the final resolution of their ICG request, elementary School District 130 convened a multidisciplinary conference and determined that J.B. was not eligible for special education services under the IDEA, P.L. 105–17 § 614, or Article 14 of the Illinois School Code, 105 ILCS 5/14 *et seq.* (1997). J.B.'s parents challenged this decision in a Level I due process hearing under section 614(f)(1) of the IDEA. Both J.B.'s parents and School District 130 sought to join the DHS as a party to the hearing, but the motions for joinder were denied by the Level I hearing officer. On April 30, 1993, the Level I hearing officer ordered School District 130 to fund the entire cost of J.B.'s placement at Kid's Peace. School District 130 complied with this order through the end of the 1993–1994 school year, at which time J.B. became the programmatic and financial responsibility of plaintiff Community High School District 218.

On September 12, 1994, School District 218 proposed an interim educational plan whereunder it agreed to fund the entire cost of J.B.'s placement at Kid's Peace until it con-

---

**1.** The Illinois Department of Mental Health and Developmental Disabilities was renamed the Illinois Department of Human Services on July 1, 1997. 20 ILCS 1705/2(a).

**2.** Howard A. Peters III is substituted for defendant Ann Patla, who previously served as Acting Director of the Department of Mental Health and Developmental Disabilities.

ducted a complete reevaluation of his educational needs. Although the School District invited DHS to send a representative to the planning conference, DHS declined to participate. The District subsequently convened the conference without DHS and determined that J.B.'s educational needs could be met in a therapeutic day program rather than in a twenty-four hour residential care facility. J.B.'s parents challenged this recommendation in yet another Level I due process hearing, which was held before Dr. Rosina M. Gallagher on February 28, 1995. The School District again moved to join the DHS as a party to the hearing, but the motion for joinder was denied. Following the hearing, Dr. Gallagher ordered the School District to continue funding the entire cost of J.B.'s placement at Kid's Peace, and this decision was affirmed on review by a Level II hearing officer. The Level II hearing officer also affirmed the denial of the motion for joinder.

The School District then filed the instant five count complaint. In count I, plaintiff challenges the administrative determination that J.B. needs residential placement in order to receive a free appropriate public education as guaranteed by the IDEA. In counts II through V, the School District argues that defendants ISBE and DHS failed to adopt an interagency agreement that meets the substantive requirements of the IDEA. While Parent Defendants moved to dismiss the entire complaint for lack of jurisdiction and failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6), they were not implicated in counts II through V of the complaint and therefore lacked standing to seek dismissal of those counts under Rule 12(b)(6). The Agency and Director Defendants filed neither a motion to dismiss nor a motion for summary judgment. The court thereafter determined that plaintiff lacked standing to proceed with counts II through V of the complaint and dismissed them for lack of subject matter jurisdiction under Rule 12(b)(1).[3]

The School District moved the court to vacate this order on the grounds that, by considering matters beyond the scope of the pleadings, the court effectively converted the motion to dismiss into a motion for summary judgment and should have allowed plaintiff to present additional evidence to establish jurisdiction. Fed.R.Civ.P. 12(c). While there is little question that the court may consider matters beyond the scope of the pleadings when it resolves questions pertaining to jurisdiction, *see English v. Cowell*, 10 F.3d 434, 437 (7th Cir.1993), citing *Crawford v. United States*, 796 F.2d 924, 928 (7th Cir.1986) ("The omission ... of a provision for converting a Rule 12(b)(1) motion into a summary judgment motion ... was not an oversight"), the court nevertheless elected to reexamine whether plaintiff's apparent failure to state a claim in counts II through V was sufficient to deprive the court of jurisdiction.

■ The federal courts lack subject matter jurisdiction over claims whose "unsoundness so clearly results from the previous decisions of [the Supreme Court] as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy." *Hagans v. Lavine*, 415 U.S. 528, 538, 94 S.Ct. 1372, 1379, 39 L.Ed.2d 577 (1974). The Seventh Circuit has stated that this "substantiality doctrine" requires the court to examine the scope of its jurisdiction based on an assessment of the complaint that is confusingly similar to the analysis for failure to state a claim under Rule 12(b)(6). *Ricketts v. Midwest National Bank*, 874 F.2d 1177, 1180 (7th Cir.1989). The failure to state a claim will not deprive the court of subject matter jurisdiction if the "complaint raises an arguable question of law which the court may ultimately resolve against the plaintiff." *Id.* at 1182 n. 5, citing *Neitzke v. Williams*, 490 U.S. 319, 328, 109 S.Ct. 1827, 1833, 104 L.Ed.2d 338 (1989). Thus:

> [I]f a federal statute upon which a claim is premised is interpreted to be inapplicable, it could be argued that the plaintiff has failed to present a federal question and thus subject matter jurisdiction is absent. However, the courts have uniformly held that in such instances the preferable practice is to assume that jurisdiction exists and proceed to determine the merits of the claim pursuant to Rule 12(b)(6) or Rule 56.

---

**3.** This opinion appears at 940 F.Supp. 1321.

*Health Cost Controls v. Skinner,* 44 F.3d 535, 537 (7th Cir.1995), *quoting* 2A James W. Moore *et al.,* Moore's Federal Practice ¶ 12.07[2.–1] (2d ed.1994) (marks omitted). Unless the complaint bears a defect which is "clearly incurable," the court must "grant the plaintiff leave to amend, allow the parties to argue the jurisdictional issue, or provide the plaintiff with the opportunity to discover the facts necessary to establish jurisdiction." *Shockley v. Jones,* 823 F.2d 1068, 1073 (7th Cir.1987).

In an abundance of caution, the court decided to give plaintiff further opportunity to address the jurisdictional issues raised in its order of dismissal. It therefore solicited briefs from the School District and Agency Defendants on the issue of whether the IDEA confers a private right of action on local school districts to challenge the adequacy of a state interagency agreement under section 612(a)(12)(A). The court then vacated its order of dismissal on May 27, 1997 and invited the School District to submit additional briefs and evidentiary materials to show why summary judgment should not be granted *sua sponte* in favor of Agency and Director Defendants on counts II through V of the complaint. Upon filing the requested materials, plaintiff withdrew count V of the complaint. The court then held an evidentiary hearing on counts II through IV of the complaint and granted plaintiff leave to file additional briefs in response to specific questions concerning the effect of the IDEA amendments that were enacted on June 4, 1997. The court now believes that plaintiff has had ample notice and opportunity to address the jurisdictional issues in this case and, for the reasons set forth below, will now grant summary judgment sua sponte in favor of Agency and Director Defendants on counts II through IV of the complaint.

## II. *Analysis*

Summary judgment is appropriate if the evidence establishes that there is no genuine issue of material fact and the non-moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In reaching this determination, the court must view the evidence and draw all permissible inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106

S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). Summary judgment may not be entered *sua sponte* unless the party who is adversely affected by that ruling is given adequate notice and a fair opportunity to be heard. *English,* 10 F.3d at 437; *see also Goldstein v. Fidelity and Guaranty Ins. Underwriters, Inc.,* 86 F.3d 749, 750 (7th Cir.1996). The Seventh Circuit has advised that granting summary judgment *sua sponte* warrants special caution and should be undertaken only if the outcome is clear and the opposing party has had an adequate opportunity to respond. *English,* 10 F.3d at 437, *citing Sawyer v. United States,* 831 F.2d 755, 759 (7th Cir. 1987).

This opinion addresses only counts II through IV of the complaint. In count II, the School District alleges that the ISBE and DHS failed to adopt an interagency agreement that meets the substantive requirements of the IDEA as set forth in P.L. 105–17 § 612(a)(12)(A). The District contends that the Agency Defendants failed to create procedures whereunder it could obtain DHS cofunding for the cost of J.B.'s residential placement. The District further asserts that the lack of cost-shifting procedures forced it to seek reimbursement from DHS by filing the instant federal suit. In count III, plaintiff alleges that the Agency Defendants discriminated against disabled individuals such as J.B. by limiting the availability of special education funds in violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a). In count IV, the School District claims that it was forced to initiate the instant lawsuit in part because the ISBE erroneously instructs its Level I and Level II hearing officers that they do not have jurisdiction to join the DHS as a party to administrative due process hearings under the IDEA.

█  Plaintiff seeks both legal and equitable relief. Plaintiff seeks to recover the litigation expenses that it incurred as a consequence of its efforts to obtain DHS cofunding for the cost of J.B.'s residential placement. Notably, this is properly construed as a claim for damages rather than a claim for fees *per se.* The School District is not entitled to fees *qua* fees in this action because the IDEA

contains a explicit fee-shifting provision which permits the court to award reasonable fees to the parents of a disabled child who prevails in an administrative due process hearing but makes no analogous provision for non-parent parties. *Id.* at § 615(i)(3)(B); *see also Barbara Z. v. Obradovich*, 937 F.Supp. 710, 718 (N.D.Ill.1996); *Northfield Township H.S. Dist. 225 v. Roy H.*, 1995 WL 12249, *3 & n. 4 (N.D.Ill.1995) (not published F.Supp.). While the Eleventh Amendment ordinarily would bar any such claim for damages against an agency of the state in federal court, *Will v. Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), Congress expressly abrogated that immunity with respect to claims arising under the IDEA. P.L. 105–17 § 604. In addition to the claim for damages, plaintiff seeks an injunction requiring Director Defendants to draft an interagency agreement that comports with section 612(a)(12)(A) of the IDEA and ordering defendant ISBE to instruct its hearing officers that they do in fact have jurisdiction to join the DHS as a party to IDEA due process hearings.

Before reaching the merits of these claims, however, the court must consider whether plaintiff has standing to bring them. The doctrine of standing derives from Article III of the United States Constitution, which limits the subject matter jurisdiction of the federal courts to "actual cases and controversies." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 37, 96 S.Ct. 1917, 1923–24, 48 L.Ed.2d 450 (1976). This doctrine has been construed to impose the following three requirements on claimants:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some thirty party not before the court. Third, it must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992); *see also Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982).

The doctrine of mootness is closely related to the doctrine of standing. In order to have standing, a claimant must have "a personal interest in the case at its inception and maintain that interest throughout the litigation." *U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980). Where the claimant loses its interest in a particular claim or the outcome of the suit, the claim becomes moot and the court loses its jurisdiction to resolve it. *Holstein v. City of Chicago*, 29 F.3d 1145, 1147 (7th Cir.1994). Where a defendant offers to satisfy a plaintiff's entire claim, the claim becomes moot the plaintiff "loses outright" under Federal Rule of Civil Procedure 12(b)(1). *Id.*

The School District presents several theories of injury in its bid to establish standing. First, it claims that it was required to fund portions of J.B.'s residential placement for which DHS was responsible under state and federal law. Second, it alleges that the lack of a proper interagency agreement forced it to file the instant lawsuit—and thus to incur unnecessary litigation expenses—to obtain DHS cofunding for the cost of J.B.'s residential placement. Third, it argues that defendant ISBE caused an overall reduction in the availability of special education resources in Illinois by using federal IDEA funds to cover special education costs that should have been paid by DHS. These allegations of injury all presume that DHS is responsible in whole or in part for the cost of J.B.'s residential placement at Kid's Peace. A close analysis of the IDEA and Illinois state law suggests that this presumption is misplaced.

The IDEA provides that a state may receive federal funds for special education if it implements "policies and procedures to ensure that ... a free appropriate public education is available to all children with disabilities residing in the State." P.L. 105–17 § 612(a)(1)(A). The primary responsibility for funding the cost of a free appropriate public education is vested in the state education agency. Section 612(a)(11)(A) pro-

vides that "[t]he State educational agency is responsible for ensuring that … the requirements of this part are met," and these "requirements" include the obligation to provide a free appropriate education as set forth in section 612(a)(1). The IDEA nevertheless contemplates that participating states will assign certain special education costs to administrative agencies other than the state educational agency, *id.* at § 612(a)(11), and it defines the financial responsibility of noneducational state agencies as follows:

> (i) IN GENERAL.—If any public agency other than an educational agency is otherwise obligated under Federal or State law, or assigned responsibility under State policy or pursuant to [an interagency agreement drafted in compliance with section 612(a)(12)(A) ], to provide or pay for any services that are also considered special education or related services … that are necessary for ensuring a free appropriate public education to children with disabilities within the State, such public agency shall fulfill that obligation responsibly. …
>
> (ii) REIMBURSEMENT FOR SERVICES BY PUBLIC AGENCY.—If a public agency other than an educational agency fails to provide or pay for the special education and related services described in clause (i), the local educational agency … shall provide or pay for such services to the child. Such local educational agency may then claim reimbursement for the services from the public agency that filed to provide or pay for such services and such public agency shall reimburse the local educational agency or State agency pursuant to the terms of the interagency agreement or other mechanism described in subparagraph (A)(i) according to the procedures established in such agreement pursuant to subparagraph (A)(ii).

*Id.* at § 612(a)(12)(B)(i)–(ii). Under this statutory scheme, a noneducational state agency has no obligation to share the cost of a free appropriate public education unless it is designated to bear those costs by (i) state statutes or regulations, (ii) federal statutes or regulations, or (iii) a state interagency agreement or comparable cost-shifting procedures. The IDEA itself does not purport to choreograph precisely which noneducational agen-

cies, if any, will be responsible for sharing the cost of special education.

If a public agency other than the state educational agency is designated to share the cost of a free appropriate public education, then the chief executive officer of the state must ensure that "an interagency agreement or other mechanism for interagency coordination is in effect" to facilitate the allocation of costs between that agency and the state education agency. *Id.* at § 612(a)(12)(A). These cost-shifting procedures may be set forth in a "(i) state statute or regulation; (ii) signed agreement between respective agency officials that clearly identify the responsibility of each agency relating the provision of services; or (iii) other appropriate written methods as determined by the Chief Executive Officer of the State or designee of the officer." *Id.* at § 612(a)(12)(C). These cost-shifting procedures must include the following:

> (i) AGENCY FINANCIAL RESPONSIBILITY.—An identification of, or a method for defining, the financial responsibility of each agency for providing services … to ensure a free appropriate public education to children with disabilities, provided that the financial responsibility of each public agency … shall precede the financial responsibility of the local educational agency (or the State agency responsible for developing the child's IEP).
>
> (ii) CONDITIONS AND TERMS OF REIMBURSEMENT.—The conditions, terms, and procedures under which a local educational agency shall be reimbursed by other agencies.
>
> (iii) INTERAGENCY DISPUTES.—Procedures for resolving interagency disputes (including procedures under which local educational agencies may initiate proceedings) under the agreement or other mechanism to secure reimbursement from other agencies or otherwise implement the provisions of the agreement or mechanism.
>
> (iv) COORDINATION OF SERVICES AND PROCEDURES.—Policies and procedures for agencies to determine and identify the interagency coordination responsibilities of each agency to promote the coordination and timely and appropri-

ate delivery of services described in subparagraph (B)(i).

*Id.* at § 612(a)(12)(A)(i)–(iv). In short, the state must develop cost-shifting procedures in compliance with section 612(a)(12)(A) only when it designates a particular noneducational state agency to share the cost of a free appropriate public education.

■ The court must therefore consider whether there is any state or federal law which requires DHS to share the cost of free appropriate public education under the IDEA. Plaintiff asserts that DHS is partially liable for the cost of J.B.'s residential placement under three separate provisions of the Illinois Mental Health and Developmental Disabilities Administrative Act. 20 ILCS 1705 *et seq.* (*eff.* July 1, 1997). The first of these specifies that DHS must:

> provide for all recipients living in State mental health facilities between the ages of 3 and 21 years special education services, as defined by [DHS], to the extent that such services are practical for each child's needs.

20 ILCS 1705/11.1. To the extent that this provision requires DHS to fund special education services that in some cases may also be necessary for a free appropriate public education as defined by the IDEA, it makes DHS a "public agency other than an educational agency" for which cost-shifting procedures must be developed pursuant to section 612(a)(12)(A). Because J.B. does not reside in a state mental health facility, however, section 1705/11.1 provides no basis for DHS cofunding in the instant case.

■ The second provision of Illinois law which plaintiff cites in support of its argument that DHS is partially liable for the cost of J.B.'s residential placement is 20 ILCS 1705/7.1. That provision states:

> To place children with mental illness, for whom no appropriate care is available in Department facilities, in licensed private facilities, [DHS] shall supplement the amount a family is able to pay, as determined by [DHS] and the amount available from other sources, provided [DHS] shall not exceed a uniform maximum rate to be determined from time to time by [DHS].

20 ILCS 1705/7.1. This statute is the authority for the state regulations which provide for Individual Care Grants to children who are mentally ill. 59 IL ADC §§ 135.10, 135.20(a). Those regulations provide that each ICG application must be reviewed by an eligibility determination panel comprised of three DHS employees and, if necessary, by a similarly constituted Director's level appeal board. 59 IL ADC §§ 135.50, 135.70. Subsequent appeals are governed by the Illinois Administrative Review Law and must be filed in the Circuit Court of Illinois within 35 days of the final agency action. 735 ILCS 5/3–103. To the extent that an ICG award may cover expenses which are also necessary for a free appropriate public education, section 1705/7.1 provides yet further evidence that DHS is an agency for which cost-shifting procedures must be developed under section 612(a)(12)(A).

Section 1705/7.1 does not, however, require DHS to share the cost of J.B.'s residential placement in the instant case. J.B.'s application for an ICG was denied by defendant DHS in apparent conformity with the procedures outlined above. J.B. did not appeal to the Circuit Court of Illinois as was permitted by the Illinois Administrative Review Act, and his time for doing so has long expired. Because section 1705/7.1 does not authorize the School District to seek ICG funding on J.B.'s behalf, and because the IDEA does not confer jurisdiction on the federal courts to review ICG eligibility determinations, the court finds that section 1705/7.1 does not impose any further obligation on DHS to investigate J.B.'s need for ICG assistance. While the IDEA requires state agencies to fund the cost of a free appropriate public education to the extent that they are required to do so by state law, it does not invite the federal courts to interfere with the state legal procedures by which the scope of that liability is determined.

■ A third state statutory provision cited by plaintiff recognizes that DHS may be obliged to fund a variety of community mental health services that are provided under the Medicaid Clinic Option authorized by Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, which provides services that are needed "to help persons with mental illness develop skills for living." 20 ILCS

1705/15.3 (*eff.* July 1, 1997). The services for which DHS may be financially responsible under this statutory provision include several items listed as "special education and related services" in the IDEA. Compare 20 ILCS 1705/15.3 with P.L. 105–17 § 602(22). While this statute implies that DHS may have to contribute to the cost of services that in some cases are also necessary for a free appropriate public education, it does not make DHS liable for the cost of J.B.'s residential placement in the instant case because there is no evidence that J.B. receives services under the Social Security Act.

It is also conceivable that DHS might be obligated to share the cost of J.B.'s residential placement under the terms of the interagency agreement that was adopted by the Agency Defendants in November, 1996. Plaintiff insists, however, that this agreement does not require DHS to fund the cost of special education and does not provide any means for local school districts to seek reimbursement from that agency. According to plaintiff, the agreement is merely a "nonbinding promise to develop cooperative funding mechanisms." (Resp. to S.J. at 7.) The court relies on these representations in finding that the interagency agreement promulgated in November of 1996 does not require DHS to share the cost of special education and related services under the IDEA.

To the extent that DHS may be required by Illinois law to underwrite the cost of a free appropriate public education in some cases, then, it is an "agency other than an educational agency" for which the state must create an appropriate cost-shifting agreement or its equivalent as required by section 612(a)(12)(A). The court is aware of nothing in Illinois or federal law, however, which requires DHS to share the cost of J.B.'s residential placement in the instant case. Because the School District was not entitled to seek DHS cofunding for the cost of J.B.'s residential placement, then, it did not suffer any redressable injury by virtue of the lack of state cost-shifting procedures described in section 612(a)(12)(A).

There is also evidence before the court which suggests that the claims set forth in counts II through IV are moot. Defendant ISBE produced an affidavit by its Principal Fiscal Consultant Jan Tanner which indicates that the School District was reimbursed for all tuition costs in excess of those for which it would have been responsible if J.B. had been enrolled in a therapeutic day school. (Tanner Aff. 8/5/97 at ¶ 4.) The ISBE reimbursed the School District for all of J.B.'s room and board costs for the school years ending in 1995 and 1996, and it is currently in the process of reimbursing those costs for the present school year in compliance with its standard accounting practices. (*Id.* at ¶¶ 8–14.) The ISBE also reimbursed the School District for 80 percent of the cost of special transportation—the total amount for which it was eligible—for the school years ending in 1995 and 1996, and is in the process of paying those costs for the current school year as well. (*Id.* at ¶¶ 15–19.) Based on this information, the court finds that plaintiff had no reason to seek reimbursement from DHS for the cost of J.B.'s residential placement.

In a final bid to establish standing, the School District alleges that defendant ISBE depleted the overall amount of federal IDEA funds available in Illinois by using those funds to cover special education expenses that should have been paid out of the state treasury by defendant DHS. This argument fails for two reasons. First, the School District has not shown that there was an improper reduction of IDEA funds in Illinois because it has not demonstrated that ISBE paid for special education costs that should have been covered by DHS. Second, the District has not indicated how the alleged "overall reduction" in IDEA funds caused it to incur unreimbursed expenses, deprived its students of a free appropriate public education, or otherwise caused it any specific injury. The court therefore finds that plaintiff has failed to demonstrate any redressable injury and lacks standing to present the allegations in counts II through IV.[4]

---

4. Because the School District has not demonstrated that it has suffered any redressable injury due to the lack of appropriate state procedures for shifting special education costs onto DHS, the court need not reach the question of whether the IDEA creates a private right of action under which the School District may enforce section 612(a)(12)(A).

ORDERED: The court grants summary judgment *sua sponte* on counts II through IV of the complaint in favor of Agency and Director Defendants.

## MEMORANDUM OPINION AND ORDER ON RECONSIDERATION

Plaintiff moves the court to reconsider and vacate its order granting summary judgment *sua sponte* to Agency Defendants on counts II through IV of its complaint. *See Community High S. Dist. 218 v. Illinois State Bd. of Educ.*, 979 F.Supp. 1203 (N.D.Ill.1997). The legal and factual bases of those claims are described in the previous order and will not be repeated here. For the reasons set forth below, plaintiff's motion for reconsideration is denied.

### A. *DHS Cofunding for Residential Placement*

The School District maintains that DHS is a "public agency other than an educational agency" that must share the cost of J.B.'s residential placement and must form an interagency agreement that complies with the terms of section 612(a)(12)(A) of the IDEA. *See* P.L. 105–17 § 612(a)(12). The court held that DHS was not required to cofund J.B.'s residential placement under federal or state law and that the School District therefore lacked standing to challenge any defects in the State's current interagency agreement. 979 F.Supp. at 1210.

In its motion for reconsideration, the School District asserts that the court erroneously held that "DHS is not an agency designated to provide special education services under either State or federal law" and that "DHS is not subject to the terms of Section 612(a)(12) of the IDEA." (Mot. for Recons. at 3, 4.) These statements seriously misrepresent the court's holding. There is nothing in the opinion which suggests that DHS is exempt from section 612(a)(12) or that it is excused from providing special education services under state or federal law. In *dicta*, the court actually suggests the opposite:

> To the extent that [20 ILCS 1705/11.1] requires DHS to fund special education services that in some cases may also be necessary for a free appropriate public education as defined by the IDEA, it makes DHS a 'public agency other than an educational agency' for which cost-shifting procedures must be developed pursuant to section 612(a)(12)(A). 979 F.Supp. at 1209–10.

> To the extent that an ICG award may cover expenses which are also necessary for a free appropriate public education, section 1705/7.1 provides yet further evidence that DHS is an agency for which cost-shifting procedures must be developed under section 612(a)(12)(A). 979 F.Supp. at 1209–10.

> [20 ILCS 1705/15.3] implies that DHS may have to contribute to the cost of services that in some cases are also necessary for a free appropriate public education [thus making it subject to section 612(a)(12)(A) of the IDEA]. 979 F.Supp. at 1210.

> To the extent that DHS may be required by Illinois law to underwrite the cost of a free appropriate public education in some cases, then, it is an 'agency other than an educational agency' for which the state must create an appropriate costshifting agreement or its equivalent as required by section 612(a)(12)(A). 979 F.Supp. at 1210.

Rather than finding that DHS is exempt from section 612(a)(12)(A), the court held that DHS was not required to share the cost of J.B.'s residential placement *in this case* and consequently that the School District did not suffer any injury due to the lack of effective cost-shifting procedures.

The School District advances several new arguments in an effort to show that DHS must share the residential placement costs in this case. It contends that J.B. is entitled to receive an Individual Care Grant because "nothing in the implementing statute for the ICG program, 20 ILCS 1705/7.1, indicates that DHS's funding obligations are in any way contingent upon DHS's own discretion." (Mot. for Recons. at 4.) As discussed previously, DHS has broad discretion to award or deny Individual Care Grants by virtue of the regulations promulgated under section 1705/7.1. See 979 F.Supp. at 1209–10, *discussing* 59 IL ADC § 135.10 *et seq.* The fact that section 1705/7.1 does not expressly confer discretion on DHS to determine whether a particular child has a mental illness for which he might receive ICG assistance cannot imply that such discretion is prohibited.

Significantly, the School District does not suggest that the IDEA confers jurisdiction on the federal courts to review state ICG award decisions. (Mot. for Recons. at 5) (citing with approval the court's finding that the IDEA "does not invite the federal courts to interfere with the state legal procedures by which the scope of [IDEA] liability is determined"). Plaintiff has therefore failed to show that 20 ILCS § 1705/7.1 requires DHS to fund the cost of residential placement in this case.

The School District also argues that DHS has mandatory funding responsibilities under a section of the IDEA which provides that "such public agency shall fulfill that [funding] obligation." P.L. 105–17 § 612(a)(12)(B)(i). The court has already explained that the phrase "such public agency" refers only to those agencies which are specifically designated to share the cost of a free appropriate public education by state statutes or regulations, federal statutes or regulations, or state interagency agreements or comparable cost-shifting procedures. 979 F.Supp. at 1208–09. Because there is no state or federal law that specifically requires DHS to share the cost of J.B.'s residential placement, the School District cannot show that DHS has mandatory finding obligations in this case. To hold that DHS has such obligations under the text of section 612(a)(12)(B)(i) itself would render the qualifying phrases of that statute meaningless.

The School District argues that the court overlooked "several significant admissions by the State Agencies" that were contained in the evidentiary materials filed in a case currently pending before Judge Gottschall. *Bd of Ed. of Crete–Monee Comm. Unit Sch. Dist. No. 201–U v. ISBE et al.*, No. 94 C 992 (N.D.Ill.). Apparently the Agency Defendants acknowledged that DHS is responsible for providing special education and related services under the IDEA. While the court emphatically rejects any suggestion that it is bound to discover and consider the admissions of a party in another case, it notes that these alleged admissions are entirely consistent with the court's ruling because they do not bear upon the issue of whether the School District has suffered an injury in this case.

The School District also challenges the court's finding that DHS has no obligation to fund J.B.'s placement under the interagency agreement of November 1996. The court made this finding on the basis of plaintiff's own representation that the agreement was "merely a non-binding promise to develop cooperative funding mechanisms." (Pl.'s Resp. to S.J. at 7.) The School District now asserts that the agreement "unequivocally commits" the State to develop cost-shifting mechanisms that comply with the IDEA. (Mot. for Recons. at 7.) Plaintiff cannot have it both ways. The concept of a "non-binding promise" is antithetical to that of an "unequivocal commitment," and plaintiff is now estopped from asserting otherwise. *See Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir.1996) (motion for reconsideration is not a vehicle for presenting new arguments). Even if the agreement were construed to require DHS to develop appropriate cost-shifting procedures, however, it would not necessarily bind that agency to fund the cost of J.B.'s residential placement in this case. Unless the School District can show that DHS must cofund the residential placement costs in this particular case, it must find another forum to contest the apparent inadequacies of the state's interagency agreement.

### B. *Reduction of IDEA Funds in Illinois*

The court also held that counts II through IV were moot in light of evidence that the School District was reimbursed for all costs in excess of those for which it would have been responsible if J.B. were enrolled in a therapeutic day school. 979 F.Supp. at 1211–12. Plaintiff contends that this ruling "seems to overlook the evidence produced by the School District which shows that significant portions of J.B.'s placement that are clearly noneducational are being funded by federal IDEA dollars." (Mot. for Recons. at 9.) Plaintiff suggests that "[b]ecause the ISBE has used special education funds for non-special education purposes, the School District, along with all other local school districts in Illinois, has been injured through a reduction in the total amount of federal IDEA funding available to pay for legitimate special education programs and costs." (*Id.*) The court previously rejected this argument

because the School District did not show how the "overall reduction in IDEA funds caused it to incur unreimbursed expenses, deprived its students of a free appropriate public education, or otherwise caused it any specific injury." 979 F.Supp. at 1211–12. Hoping to recover the point, plaintiff now argues that its reimbursement was "prorated based on available funding from the State legislature" and that the rate of reimbursement would have increased if more IDEA funds were available in the state. (Mot. for Recons. at 10.) Plaintiff cites paragraphs 6, 7, 17, and 18 of the Tanner Affidavit as evidence that it received only partial reimbursement for J.B.'s tuition and transportation costs.

As an initial matter, the court notes that this argument is barred because plaintiff did not discuss the Tanner Affidavit or the significance of the prorated reimbursement schedule in its supplemental memorandum of August 25, 1997. *Shell Oil Co.*, 91 F.3d at 876 (motion for reconsideration not a vehicle for new evidence or arguments); *Hunt–Golliday v. Metropolitan Water Reclamation District of Greater Chicago*, 104 F.3d 1004, 1010 n. 2 (7th Cir.1997) (court is "not obliged to scour the record looking for factual disputes"). In order to resolve this issue on substantive rather than technical grounds, however, the court will explain why partial reimbursement is not an injury for which plaintiff is entitled to relief.

The School District argues that defendant ISBE should not have used IDEA funds to underwrite the cost of J.B.'s residential placement because that placement was not necessary in order for J.B. to receive a free appropriate public education under the statute. Because the court had not decided whether J.B. was entitled to residential placement when it granted summary judgment in favor of Agency Defendants, it must now assume *arguendo* that he is not. Under this scenario, the State is equitably estopped from recovering past expenditures for residential placement because J.B.'s parents placed their son in a residential facility in reliance on the administrative orders of 1993 and 1995. *See Town of Burlington v. Department of Education*, 736 F.2d 773, 800–801 (1st Cir.1984) (local educational agency is estopped from seeking reimbursement from parents for cost of placement made pursuant

to state administrative order). Accordingly, the School District cannot show that the expenditure of IDEA funds for the cost of J.B.'s past residential placement improperly depleted the amount of IDEA money available in Illinois. Even if it were to prevail on count I, then, the School District would be unable to demonstrate any compensable injury in this case.

ORDERED: For the foregoing reasons, plaintiff's motion for reconsideration of the court's order of September 3, 1997 granting summary judgment *sua sponte* to Agency Defendants on counts II through IV is denied.