**S.C., a minor child, by his parents, C.C. and K.C., Plaintiffs,**

v.

**DEPTFORD TOWNSHIP BOARD OF EDUCATION, Defendant,**

**Deptford Township Board of Education, Third–Party and Counterclaim Plaintiff,**

v.

**Department of Education of the State of New Jersey; Department of Human Services, Division of Developmental Disabilities of the State of New Jersey, Third–Party Defendants,**

**S.C., a minor child, by his parents, C.C. and K.C., Counterclaim Defendants.**

**CIVIL ACTION NO. 01–5127.**

United States District Court, D. New Jersey.

Aug. 7, 2002.

Herbert D. Hinkle, Esq., Law Offices of Herbert D. Hinkle, Lawrenceville, NJ, for Plaintiffs, C.C. and K.C., on behalf of the minor child, S.C.

James F. Schwerin, Esq., Parker, McCay & Criscuolo, P.A., Lawrenceville, NJ, for Defendant and Third–Party Plaintiff, Deptford Township Board of Education.

David Samson, Esq., Attorney General, Beth Leigh Mitchell, Esq., Deputy Attorney General, Trenton, N.J., for Third–Party Defendants, New Jersey Department of Education and New Jersey Department of Human Services, Division of Developmental Disabilities.

## OPINION

ORLOFSKY, District Judge.

## I. INTRODUCTION

The Individuals with Disabilities Act, 20 U.S.C. §§ 1401–1487 (2000) ("IDEA"), is not a well-drafted law. Its goal of providing a free and meaningful education to every disabled child in America is undoubtedly a noble one. By all accounts it has done much to achieve that goal. Yet, as this case illustrates, after thirty years and much congressional tinkering, the text of the IDEA still leaves courts at a loss to answer many basic questions about how it is to be enforced, such as who may sue whom, for what, and in what court.

As a result, the merits of this case are obscured by a thicket of procedural questions. The thorniest of these is whether or not the IDEA provides a private right of action for the Defendant and Third–Party Plaintiff, a local school district in New Jersey, to sue two New Jersey state agencies for the costs the local school board incurred in providing a free and appropriate public education to the Plaintiff, a disabled child. Relatedly, I also must determine whether or not the local school district has standing to sue.

Only after clearing away that underbrush can I reach the significant question raised by the Third–Party Complaint, namely, whether or not New Jersey's system for funding special education for children with serious disabilities violates federal law. New Jersey, according to the Third–Party Defendants, imposes the full costs of educating a disabled child on the local school district where that child resides. The clear text of the IDEA, however, requires the States to ensure that state agencies who already provide certain special services necessary to a child's education, such as residential psychiatric care, will provide those services to needy disabled children at no cost to the children's parents or the local school districts.

I conclude, therefore, that the IDEA requires one of the Third–Party Defendant agencies, the Division of Developmental Disabilities, to reimburse the Third–Party Plaintiff school district for some of the expenses it incurred providing an edu-

cation to the Plaintiff disabled child, assuming that the Third–Party Plaintiff can establish that the Plaintiff was entitled to DDD's services. In the event that DDD cannot or will not pay, I also determine that the other Third–Party Defendant, the New Jersey Department of Education, must pay instead. However, because the Third–Party Plaintiff school board lacks standing to raise one small part of its claims, I will grant the Third–Party Defendant's pending Motion to Dismiss in part, but deny the remainder.

## II. FACTS AND PROCEDURAL HISTORY

The Plaintiff, S.C., is an autistic child. According to the Complaint filed by S.C.'s parents, C.C. and K.C. ("the parents"), S.C.'s condition poses severe barriers to his ability to learn in an ordinary educational environment. *See* Compl. at ¶ 1. S.C. resides in Deptford Township, a New Jersey municipality. Because New Jersey has accepted funds from the federal government under IDEA, Deptford's Board of Education ("Deptford" or "the Board") is a "local educational agency" as defined in that Act. *See* 20 U.S.C. § 1401(15). That is, the Board is primarily responsible for assuring that S.C. will receive a free appropriate public education, or "FAPE." *Id.* § 1413.

In the period immediately preceding the dispute that produced this litigation, S.C. was attending a day program at the Bancroft School, a facility designed to educate students with special needs. Because S.C.'s maladaptive behaviors were increasing and he was regressing academically, S.C.'s parents requested that Deptford place S.C. in a residential program to teach S.C. to control his maladaptive behavior, to reverse S.C.'s academic regression, and to receive an appropriate education. Compl. at ¶¶ 7–9. Deptford denied this request. *Id.* at ¶ 10. In response, S.C. and his parents filed a petition for a due process hearing with the New Jersey Department of Education, pursuant to 20 U.S.C. § 1415(i) and N.J. Admin. C. § 6A:14–2.7. *Id.* at ¶ 11.

A due process hearing was held in April and May of 2001 before the New Jersey Office of Administrative Law. *Id.* at §§ 11–12. On August 21, 2001, ALJ Joseph Fidler issued his final decision, in which he found that: (1) the school district had not met its burden of showing, by a preponderance of the credible evidence, that it had offered an appropriate Individual Education Plan ("IEP") to S.C.; (2) S.C. was not receiving a meaningful educational benefit at Bancroft as a day student; and (3) the credible evidence demonstrated that S.C. required a residential placement of the sort provided by the Lindens program at the Bancroft School. The ALJ ordered Deptford to prepare an appropriate IEP for S.C. in accordance with his findings. *See C.C. AND K.C. ON BEHALF OF S.C. v. DEPTFORD TOWNSHIP BD. OF EDUC.*, OAL Dkt. No. Eds.2069–01, 2001 WL 1023461, slip op. at 16 (Aug. 21, 2001). No party to the due process hearing questioned whether any state entity other than Deptford would pay for S.C.'s residential placement, and the ALJ did not address that issue.

After Deptford failed, in the parents' view, to implement the ALJ's Order, S.C. and his parents filed this Complaint on October 25, 2001, asking this Court to: (1) declare that Deptford's actions have denied and continue to · deny S.C. a free appropriate public education; (2) order Deptford to implement Judge Fidler's decision; and (3) order Deptford to reimburse S.C. and his parents for attorney's fees and costs. Deptford filed a cross-motion for a stay of the ALJ's decision on November 28, 2001. On December 3, 2001, Deptford answered S.C.'s Complaint,

and filed a counterclaim challenging the ALJ's findings.

Along with its Answer, Deptford also filed a Third–Party Complaint against the New Jersey Department of Education ("DOE") and the New Jersey Department of Human Services, Division of Developmental Disabilities ("DDD"). According to Deptford, DOE and DDD are obligated, under the IDEA, to pay at least for the residential portion of S.C.'s education in the Lindens program. Deptford also alleges in its Third–Party Complaint that the DOE and DDD have failed to enter into an "interagency agreement" to provide for DDD's provision of services to students who require them in order to receive a FAPE.

On March 14, 2002, the State Defendants filed a Motion to Dismiss Deptford's Third–Party Complaint for failure to state a claim. In the course of resolving that Motion, I determined that this Court may lack subject matter jurisdiction to hear the Third–Party Complaint. Accordingly, on April 16, 2002, I sent a letter to the parties asking for supplemental briefing on the question of this Court's subject matter jurisdiction. I resolve both sets of issues in this Opinion.

## III. DISCUSSION

### A. Jurisdiction

1. **Whether the IDEA Provides Deptford with a Private Right of Action to Assert its Third–Party Claims**

Federal courts are courts of limited jurisdiction; we may not hear actions without authorization from Congress. See U.S. Const. Art. III § 1. "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Although the Third–Party Complaint does not identify the source of this Court's jurisdiction, in response to my request for supplemental briefing, Deptford argued principally that it has a private right of action against the State Defendants pursuant to 20 U.S.C. § 1415(i)(2) (2000).[1]

The difficulty with Deptford's argument is that, by its terms, the IDEA limits the scope of suits brought under it to those that are brought "with respect to the complaint presented" under § 1415. *Id.* The issue of the State Defendants' liability for S.C.'s placement, and the DOE's failure to promulgate an "interagency agreement," were not raised in "the complaint presented" to the ALJ. Accordingly, there is some question whether or not Congress' express grant of jurisdiction to parties aggrieved by the ALJ's findings can extend to Deptford's third-party claims. In addition, the State Defendants argue that, even if the IDEA would grant a right of action in general, Deptford in particular lacks standing to bring this suit because Congress intended to foreclose local school districts from bringing suits for contribution against other state entities.

█ IDEA plaintiffs may raise claims not presented in the state due process hearing if, among other reasons, it would have been impossible or futile for them to have done so. *See Honig v. Doe,* 484 U.S. 305, 326–27, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (citing *Smith v. Robinson,* 468 U.S.

1. The statute provides:
   **(2) Right to bring civil action**
   **(A) In general**
   Any party aggrieved ... by the findings and decision under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.

992, 1014 n. 17, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984)); *Beth V. v. Carroll*, 87 F.3d 80, 88–89 (3d Cir.1996). *But see County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1465 (9th Cir.1996).[2] The State Defendants do not dispute then-Judge Wolfson's lucid opinion in *L.P. v. Edison Bd. of Educ.*, 265 N.J.Super. 266, 278–80, 626 A.2d 473 (Law Div.1993), in which he concluded that New Jersey state departments can not be joined as parties to a state due process hearing (unless, one supposes, the state agency is directly providing services to the child pursuant to 20 U.S.C. § 1413(h)). Therefore, it would have been futile for Deptford to have attempted to raise its claims against DDD or DOE before the ALJ.

The fact that exhaustion would have been futile, however, does not end the inquiry. States, in all likelihood, are unwilling to consider in their IDEA due process hearings a large universe of arguments that, in their view, are unrelated to the merits of the claim. To say that impossibility alone excuses compliance with § 1415(i)(2)(A) would therefore be to license suit on virtually any subject the plaintiff can imagine. That, surely, is an absurd result.

The Third Circuit's opinion in *Beth V.*, although it does not engage this problem directly, does nonetheless account for it. According to the court, the express language of § 1415(i)(2) can encompass not only grievances pertaining to matters actually raised in a due process hearing, but also issues that *could have been* the subject of a "complaint" under the IDEA had the state's procedures not prevented the aggrieved party from raising that subject in the due process hearing. *See Beth V.*, 87 F.3d at 85–88. The IDEA, the court noted, requires states to create an opportunity to present complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate education to such child." 20 U.S.C. § 1415(b)(6) (2000). As the court explained, this requirement would be frustrated if the State's failure to create proper procedures could itself bar disabled children from securing the relief the IDEA is designed to provide. *See Beth V.*, 87 F.3d at 86 (citing *Murphy v. Timberlane Regional Sch. Dist.*, 22 F.3d 1186, 1196 (1st Cir.1994); *W.G. v. Bd. of Trustees*, 960 F.2d 1479, 1484 (9th Cir.1992); *Mrs. C. v. Wheaton*, 916 F.2d 69, 72 (2d Cir.1990); *Christopher W. v. Portsmouth Sch. Comm.*, 877 F.2d 1089, 1095 (1st Cir.1989); *Muth v. Cent. Bucks Sch. Dist.*, 839 F.2d 113, 120–26 (3d Cir.1988), *rev'd on other grounds sub nom. Dellmuth v. Muth*, 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989)); *see also J.B. v. Killingly Bd. of Educ.*, 990 F.Supp. 57, 69 (D.Conn.1997); *Barbara Z. v. Obradovich*, 937 F.Supp. 710, 719 (N.D.Ill.1996).[3] Thus, futility ex-

**2.** Although the Ninth Circuit does not mention the word "exhaustion" in its opinion, its holding—that an IDEA plaintiff could not bring a claim that was barred under state law in the due process hearing—is plainly contrary to the Supreme Court's holding in *Honig* and *Robinson*.

**3.** In interpreting the Education of the Handicapped Act, the predecessor to IDEA, the Second Circuit noted a similar gap in the structure of the statute. *See Quackenbush v. Johnson City Sch. Dist.*, 716 F.2d 141, 148 (2d Cir.1983). The court there concluded,

however, that the availability of a remedy under 42 U.S.C. § 1983 for procedural deprivations that prevented a child from ever reaching a final administrative determination made implication of the same remedy under the EHA unnecessary. The Second Circuit abandoned that logic, though, in the face of a revised EHA that made it more evident that Congress did intend to include a remedy for procedural faults. *See Mrs. C.*, 916 F.2d at 72. In any event, it is uncertain whether the same logic could apply in the case of a local school board, whose power to sue its parent state under § 1983 is uncertain. *Compare S.*

cuses compliance with § 1415(i) at least to the extent that the subject matter of the complaint in federal court could be described as "any matter relating to" one of the subjects covered by § 1415(b)(6).[4]

It might be objected that while the State is obliged under § 1415(b)(6) to create an opportunity for disabled children and their parents to present complaints, it owes no similar duty to its own local school districts. Section 1415(b)(6), however, merely directs the State to create "an opportunity to present complaints"; it says noting about to whom that opportunity must be granted. In contrast, § 1415(b)(1) states explicitly that the state must guarantee "an opportunity for the parents of a child with a disability" to examine the child's records and participate in the placement process. Thus, where Congress wanted to limit the beneficiaries of one of IDEA's procedural rights, it clearly knew how to do so. There is, therefore, "no reason to believe that Congress meant to require schools alone to exhaust in all cases." *Honig,* 484 U.S. at 327, 108 S.Ct. 592; *see also County of San Diego,* 93 F.3d at 1469 (Marsh, J., dissenting) (arguing that county's claim against California state defendants was within "any matter relating to" the underlying IDEA administrative complaint, despite county's inability to raise that claim below). Finally, to the extent that the IDEA grants to local school districts substantive rights relating to the provision of a FAPE (a question I address in the next section), it is logical that Congress would also want the state to create procedural protections aimed at guaranteeing those substantive rights.

◼ Although several Courts of Appeals outside of the Third Circuit have at times refused to permit local school districts to bring suit against their parent state under IDEA or its predecessor, those decisions are best explained on grounds of standing, not whether or not the IDEA provides a private right of action. For example, in *Andrews v. Ledbetter,* 880 F.2d 1287, 1290 (11th Cir.1989), the Eleventh Circuit held that Congress did not intend "to grant an LEA statutory standing to bring suit to compel a state agency to fulfill its statutory duties." It noted, though, that it was considering a declaratory judgment suit by a group of local school districts challenging, in general, Georgia's policies. *Id.* The outcome might have been different, the court added, if there were a concrete challenge against an individual district by a disabled child under the IDEA, with the school district attempting to defend "by asserting that the state educational agency is primarily and ultimately responsible for the Act's implementation." *Id.* at 1291. Indeed, two years later, the Eleventh Circuit found that a local school district did have standing to implead state agency defendants where there was already an underlying dispute about the education of a particular child. *See Todd D. v. Andrews,* 933 F.2d 1576, 1582–83 (11th Cir.1991). I read the Second Circuit's opinion in *County of Westchester v. New York,* 286 F.3d 150, 152 (2d Cir.2002) (per curiam) to the same effect: While a school district may sue a state agency when the school district is a "party aggrieved," IDEA does not give a general right to sue in the absence of an underlying controversy over a particular

*Macomb Disposal Auth. v. Washington Township,* 790 F.2d 500, 503 (6th Cir.1986), *with Rockford Bd. of Educ. v. Ill. State Bd. of Educ.,* 150 F.3d 686, 688 (7th Cir.1998), *United States v. Alabama,* 791 F.2d 1450, 1456 (11th Cir.1986), *and City of New Rochelle v.*

*Town of Mamaroneck,* 111 F.Supp.2d 353, 368 (S.D.N.Y.2000).

4. Because I conclude that Deptford's Third–Party Complaint falls within this territory, I need not consider where its outer bounds might be drawn.

child. *Cf. Beth V.*, 87 F.3d at 87 (distinguishing parents' claims from a challenge to the "abstract sufficiency of [the State's] procedures"). Therefore, I do not understand any of these cases to stand for the proposition that local school districts are not covered by the protections of § 1415(b)(6).[5]

I am left, then, only with the question whether or not Deptford's claims are "with respect to any matter relating to ... the provision of a free appropriate public education." Given the broad sweep of that language, *see Beth V.*, 87 F.3d at 86, resolution of disputes over who will pay for providing the FAPE surely are "with respect to any matter relating to" the FAPE. *See St. Tammany Parish Sch. Bd. v. Louisiana*, 142 F.3d 776, 783–88 (5th Cir.1998) (resolving under IDEA question whether local or state educational agency would pay for services provided to child); *Todd D.*, 933 F.2d at 1583 (same); *Jefferys v. New Jersey*, No. 95–6155, 1996 U.S. Dist. LEXIS 21360, at *23–*29 (D.N.J. Jan. 29, 1996) (same). Similarly, disputes over the existence of a non-judicial procedure for arranging such payments, although one step further removed from the FAPE itself, nonetheless are certainly "related" to the provision of the FAPE. *See Kruelle v. New Castle County Sch. Dist.*, 642 F.2d 687, 697 (3d Cir.1981) (imposing liability on state for failure to implement agreement to provide for services to disabled child); *Corey H. v. Bd. of Educ. of City of Chicago*, 995 F.Supp. 900, 918 (N.D.Ill.1998) (same); *cf.*

*Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 953 n. 5 (4th Cir.1997) (implying that, had parents made sufficient evidentiary showing, court could have considered their challenge to propriety of state's interagency agreement).

I conclude, therefore, that Deptford has "an express right of action under § 1415" to bring its claims against the State Defendants. *Beth V.*, 87 F.3d at 88. Accordingly, I need not consider whether or not Deptford could bring its claims pursuant to 42 U.S.C. § 1983 or any other provision of law.[6]

## 2. Whether Deptford has Standing

### a. Constitutional Standing

The State Defendants contend that, regardless of whether the IDEA grants school districts a private right of action in some cases, Deptford lacks standing to bring its Third–Party Complaint. The strictures of standing are often repeated, although no more comprehensible for their familiarity. In order to satisfy the case or controversy requirement of Article III, a plaintiff must: (1) have suffered an invasion of a legally protected interest which is concrete and particularized, and is not merely conjectural or hypothetical; (2) demonstrate a causal connection between the injury and the conduct of the named defendant; and (3) show that the injury is likely to be redressable by a favorable decision. *See AT & T Commun. of N.J.*,

---

**5.** I consider the question whether or not Deptford has standing to sue in the next subsection.

**6.** I note that Judge Bassler previously reached the same conclusion, although on somewhat different grounds. *See Jefferys*, 1996 U.S. Dist. LEXIS 21360, at *29–*32. According to Judge Bassler, the "broad equitable powers" available to federal courts in crafting a remedy under what is now § 1415(i)(2)(B)(iii) include the power to assert jurisdiction over

additional parties where necessary to effect full relief. Where Congress has granted broad common-law remedial authority, a federal court can create a right to contribution. *See Musick, Peeler & Garrett v. Employers Ins. of Wausau*, 508 U.S. 286, 290–91, 113 S.Ct. 2085, 124 L.Ed.2d 194 (1993); *id.* at 302, 113 S.Ct. 2085 (Thomas, J., dissenting); *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 645, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981).

*Inc. v. Verizon N.J., Inc.*, 270 F.3d 162, 170 (3d Cir.2001) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Pitt News v. Fisher*, 215 F.3d 354, 359 (3d Cir.2000)). Where an injury would be redressable under any one of several plausible readings of a statute, the plaintiff has standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95–96, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

■ Deptford's Third–Party claims, except for some of its claims for attorney's fees, meet the test of constitutional standing. Deptford has paid money it might not be obligated to pay. That is unquestionably an injury in fact. *See Bd. of Educ. of Oak Park & River Forest High Sch. Dist. No. 200 v. Kelly E.*, 207 F.3d 931, 934 (7th Cir.2000). Deptford alleges that it would not have incurred these expenses had the DDD paid for them instead, *see* Third–Party Compl. ¶ 38, and that the DDD's failure is at least partially attributable to the DOE's failure to enter into an interagency agreement with DDD to provide for such payments, *id.* ¶ 32. Crediting Deptford's allegations as true, as I must at this stage of the litigation, *see Lujan*, 504 U.S. at 561, 112 S.Ct. 2130, it has plainly satisfied the causation prong.[7]

*See Fetto v. Sergi*, 181 F.Supp.2d 53, 66 (D.Conn.2001) (holding that plaintiff's allegation that defendant's failure to enter into an interagency agreement had negatively impacted child's evaluation satisfied causation prong of constitutional standing requirement).

Finally, it is at least arguable that Deptford is entitled to relief under IDEA that would redress its injury. The IDEA may authorize a court to order reimbursement by responsible state agencies for out-of-pocket expenses by local educational agencies.[8] *See* 20 U.S.C. § 1412(a)(12)(B)(ii) (providing that State must demonstrate to satisfaction of U.S. Secretary of Education that it has provided a mechanism for reimbursing local school districts who spend their own money for special education or related services that are also available from another public agency). Deptford is also seeking an injunction. *See* Deptford's Suppl. Br. at 12 n. 9. An injunction directing the Third–Party Defendants to provide an interagency agreement could well prevent Deptford from incurring additional expenses, whether for S.C. or other children, in the future. Accordingly, it is not "merely speculative" that an injunction would benefit Deptford. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*

---

**7.** It might be argued (although the State Defendants have not) that Deptford's injury is not "fairly traceable to the challenged action of the defendant, [rather than] the result of the independent action of some Third-party not before the court." *AT & T*, 270 F.3d at 170 (internal citations and alterations omitted). That is, because the IDEA places the burden for creating an interagency agreement on the governor of a state, not on the DOE, *see* 20 U.S.C. § 1412(a)(12)(A), there might not be a causal relation between the DOE and Deptford's obligation to shoulder the full burden of S.C.'s placement. As I discuss below, however, courts have consistently read the IDEA as placing upon the state educational agency the burden of any failures to live up to the IDEA's requirements, whether by the local school board or any other state entity. In

effect, then, although not displacing the constitutional causality requirement, the IDEA helps to define causation in a way that includes the DOE. *Cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (noting that congressional determination of what may adequately redress plaintiff's injury "warrants judicial attention and respect"). Further, to the extent that the IDEA imposes an obligation directly on DDD to enter into an agreement to pay Deptford, as it at least arguably does, *see* 20 U.S.C. § 1412(a)(12)(B)(i), the Governor's failure to act is irrelevant to Deptford's claims against the DDD.

**8.** I discuss this question in more detail in the merits section of my discussion, *infra*.

*(TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Although the Governor of New Jersey is responsible for guaranteeing that an interagency agreement is in place, the statute does not seem to require his participation in crafting every agreement. *See* 20 U.S.C. § 1412(a)(12)(A) ("The Chief Executive Office ... shall ensure that an interagency agreement is in effect....."). Thus, his absence from this suit would not prevent injunctive relief from remedying Deptford's complaints.

■ Deptford lacks standing, however, to sue DOE and DDD for attorney's fees it incurred "in defending [the] action brought by ... S.C. in the Office of Administrative Law, State of New Jersey" and in this Court. Third–Party Compl. ¶¶ 31, 39. Deptford's legal fees in the action below, and in the First Party Complaint, are not "fairly traceable" to the State Defendants. *AT & T*, 270 F.3d at 170. The administrative law hearing below was initiated by S.C.'s parents, and this lawsuit was initiated by them when the Board allegedly did not comply with the ALJ's Order. Deptford does not suggest, and I cannot independently imagine, a convincing account as to how the placement offered S.C., which S.C.'s parents evidently found unsatisfactory, would have been made less objectionable by an agreement between state agencies to allocate the costs of a residential placement. One possible reading of the Third–Party Complaint suggests that perhaps Deptford might have been willing to agree to a residential placement had it not had to pay the costs upfront, with no assurance that it would be able to secure reimbursement under the IDEA. But, if so, the decision to challenge the suitability of a residential placement for S.C., rather than risk litigation against the State, was a strategic choice made by Deptford alone.

While the State Defendants may have put Deptford in a difficult position, Deptford could have responded simply by seeking contribution, as it now has done. Instead, Deptford (under this reading of the Third–Party Complaint) decided of its own accord to take two bites at the apple. The State Defendants' failure to act therefore did not have a "determinative or coercive effect" on Deptford's decision, *Bennett v. Spear*, 520 U.S. 154, 169, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), and the costs of the OAL hearing and its *sequelae* can be fairly attributed only to Deptford. Having forced S.C.'s hand by its own intransigence, Deptford now must pay the price itself.[9]

**b. Prudential Standing**

■ In addition to the strictures of constitutional standing, courts have sometimes imposed an additional set of prudential standing requirements, which are defeasible by statute. *See Bennett*, 520 U.S. at 162, 117 S.Ct. 1154. Most pertinently here, in challenges to administrative determinations where "the plaintiff is not itself the subject of the contested regulatory action, the [prudential standing test] denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). Although it is unclear whether this so-called "zone of interests" test applies to all federal statutory claims, *see Conte Bros. Auto., Inc. v. Quaker State–Slick 50, Inc.*, 165 F.3d 221, 226 (3d Cir. 1998), appeals by aggrieved parties under the IDEA are sufficiently similar to review under the APA, where the zone of interests test unquestionably applies, *see id.*,

---

**9.** I intimate no opinion as to whether Deptford would be entitled to claim attorney's fees for its Third–Party claims against the State Defendants.

that I shall assume for the sake of argument that it is applicable in this case.[10]

■ In any event, it is clear that Deptford's claims fall within the zone of interests established by the IDEA. The zone of interests test is not the equivalent of an implied right of action; Congress does not have to clearly express an intention to benefit the plaintiff. *Clarke*, 479 U.S. at 399–400, 107 S.Ct. 750. The IDEA meets and exceeds this standard; it expressly states that a "local educational agency ... may ... claim reimbursement ... from the public agency that failed to provide or pay for [special education or related services the other public agency is obliged to provide under law] and such public agency shall reimburse the local educational agency ... pursuant to the terms of the interagency agreement." 20 U.S.C. § 1412(a)(12)(B)(ii). Granted, the reimbursement procedure is designed ultimately to benefit disabled children and their parents, by guaranteeing that local school districts, not the parents, will be the parties who will have the burden of obtaining reimbursement. *See* H.R.Rep. No. 105–95, at 92 (1997), *reprinted in* 1997 U.S.C.C.A.N. 78, 89–90. Yet, by providing for reimbursement pursuant to interagency agreement—rather than, for example, simply imposing an unfunded mandate—the IDEA benefits the school district as well. *Cf. Kruelle*, 642 F.2d at 698 ("[I]t was not the desire of Congress to remove from the handicapped the burden occasioned by insufficient funding only to place it on local school boards.").

The State Defendants appear to argue that reimbursement, at least, is inconsistent with congressional purpose, because Congress intended to provide local school districts with a fixed proportion of each State's federal grant funds, and no more. *See* State Defs.' Repl. Br. at 2. The Seventh Circuit reached an analogous conclusion, holding in a decision on the merits that the IDEA's express funding formula was inconsistent with claims by local school districts for additional money from the State. *See Kelly E.*, 207 F.3d at 936–37. Oddly, although *Kelly E.* was decided nearly two years after § 1412(a)(12)(B)(ii) was enacted, the court makes no mention of it, instead declaring, "[n]othing we can find in 20 U.S.C. § 1411 or any other section of the IDEA supports such double dipping." *Id.* at 937. I think it at least arguable (and, although a plausible claim is all that is needed to establish Deptford's standing, I conclude infra that it is more than merely arguable) that § 1412 demonstrates Congress' intent to leverage additional State resources over and above 75% of the federal IDEA grant dollars on behalf of students with serious disabilities. *See* H.R.Rep. No. 105–95, at 92, *reprinted in* 1997 U.S.C.C.A.N. 89, 89 (noting that § 1412 is meant to "reinforce" the principle that "the [local school district] responsible for developing a child's IEP can look to noneducational agencies ... to pay for or provide those services they ... are otherwise responsible for").[11]

I therefore conclude that it can reasonably be presumed that Congress intended

---

**10.** Contrary to the State Defendants' suggestion, there is no indication in the Third–Party Complaint that Deptford is attempting to assert the rights of anyone other than itself. For example, Deptford does not challenge DDD's decision to place S.C. on its "wait list," rather than immediately granting him a residential placement. Accordingly, I need not consider any prudential limits on Deptford's standing to raise third-party rights. *See Pitt News*, 215 F.3d at 361–62. In addi-

tion, since this challenge arises out of Deptford's obligation to pay for the residential placement of a particular child, there is no danger that this Court might be compelled to decide a mere "generalized grievance" that might raise prudential standing concerns. *See Beth V.*, 87 F.3d at 87; *Todd D.*, 933 F.2d at 1582–83.

**11.** It might also be argued that the Secretary of Education's power to ensure that the States comply with § 1412, *see* 20 U.S.C. § 1416,

to permit Deptford's remaining Third–Party claims. Thus, assuming that the "zone-of-interests" test is even applicable, the Board's claims survive it. Since that is the last of the many standing hurdles, I conclude further that, aside from its claims for certain attorney's fees, Deptford has standing to bring its Third–Party Complaint.

## B. The Merits

### 1. Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for failure to state a claim upon which relief may be granted. "In considering a Rule 12(b)(6) motion, the Court may dismiss a complaint if it appears certain the plaintiff cannot prove any set of facts in support of its claims which would entitle it to relief." *Mruz v. Caring, Inc.*, 39 F.Supp.2d 495, 500 (D.N.J.1999) (Orlofsky, J.) (citing *Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir.1988)). "While all well-pled allegations are accepted as true and reasonable inferences are drawn in the plaintiff's favor, the Court may dismiss a complaint where, under any set of facts which could be shown to be consistent with a complaint, the plaintiff is not entitled to relief." *Id.* (citing *Gomez v. Toledo*, 446 U.S. 635, 636, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir. 1991); *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir.1990)); *see also Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Finally, Rule 12(b)(6) authorizes a court to dismiss a claim on a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

### 2. Whether DDD and DOE Can Be Liable Under the IDEA

■ Having found that Deptford's Third–Party claims emerge from the jurisdictional thicket relatively unscathed, I now must consider their merits. The State Defendants argue that the IDEA imposes no independent obligations on states or state agencies to provide services free of charge to local school districts. They also contend that, *a fortiori*, a state has no obligation to create procedures for sharing responsibility when all responsibility has been entrusted to the local districts.

The State Defendants' view is contrary to the plain meaning of the IDEA, and inconsistent with the legislative history of the 1997 amendments.[12] The State Defen-

---

implies that Congress would not want local school districts to be able to sue to enforce the IDEA. The Supreme Court has rejected the same inference in decisions considering whether or not Congress had implied a right of action under 42 U.S.C. § 1983. *See Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 514, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990); *Wright v. City of Roanoke Redev. & Hous. Auth.*, 479 U.S. 418, 428, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987); *Rosado v. Wyman*, 397 U.S. 397, 420, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). Therefore, it would be inappropriate to draw such an inference in the more-forgiving prudential standing context.

12. As a condition of receiving funding under IDEA, a State must ensure that:

(A) The Chief Executive Officer or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (B) and the State educational agency, in order to ensure that all services described in subparagraph (B)(i) that are needed to ensure a free appropriate public education are provided.... Such agreement or mechanism shall include the following:

(i) **Agency financial responsibility**

An identification of, or a method for defining, the financial responsibility of each agency for providing services described in subparagraph (B)(i) to ensure a free appropriate public education to children with dis-

dants appear to agree that the IDEA obliges them to enter into agreements providing for reimbursement to local school districts where a district pays for any special education or related services which another public agency is "otherwise obligated under Federal or State law" to provide.[13] In their view, however, "otherwise obligated" means that the public agency must have been specifically assigned to provide free services to disabled children. Since the State Defendants read New Jersey law to require local school districts to pay all associated costs of a FAPE, see State Defs.' Repl. Br. at 2 (citing N.J. Admin. C. 6A:14–1.1(d) (1998)), they conclude that no other public agency has been "otherwise obligated" to pay for such services.

I find these arguments unpersuasive. The State Defendants' reading renders § 1412(a)(12) an empty tautology that does little more than require the States to follow their own law. It is difficult to understand why Congress would have completely rewritten this section of IDEA in 1997 in order to accomplish that largely redundant purpose. More problematic is the fact that the State Defendants' reading strains the plain language of § 1412(a)(12)(B)(i). Under that section, a public agency is "otherwise obligated" not only if State law provides specifically that

the agency must pay for part of a FAPE, but also if the agency is "assigned responsibility . . . to provide or pay for any services that are also considered special education or related services . . . that are necessary for ensuring a [FAPE]." As I read this language, any time a state agency is required to provide services to the general population—special bus services for the disabled, for example—it must provide those same services to disabled students (where necessary for each student's education) at no cost to the local school district or the students. The alternative approach suggested by the State Defendants would create wasteful and duplicative overhead expenses, while squandering potential economies of scale available to a single large service-provider. I doubt that Congress intended to use scarce federal educational dollars in that fashion.

My understanding of the statute is supported by the legislative history of the 1997 amendments. In the House report, which was adopted as the official legislative history, see 20 U.S.C. § 1401 note, Congress noted that:

[Section 612, codified as § 1412, of the bill] strengthens the requirements on ensuring provision of services by noneducational agencies while retaining a single line of responsibility. The chief ex-

---

abilities, provided that the financial responsibility of each public agency described in subparagraph (B) . . . shall precede the financial responsibility of the local educational agency. . . .

. . . . .

**(B) Obligation of public agency**
  **(i) In general**
  If any public agency other than the educational agency is otherwise obligated under Federal or State law, or assigned responsibility under State policy or pursuant to subparagraph (A), to provide or pay for any services that are also considered special education or related services . . . that are necessary for ensuring a free appropri-

ate public education to children with disabilities within the State, such public agency shall fulfill that obligation or responsibility, either directly or through contract or other arrangement.
20 U.S.C. § 1412(a)(12) (2000).

**13.** The State Defendants also do not contest that, notwithstanding the fact that § 1412's standards need only be established "to the satisfaction of the Secretary [of Education]," 20 U.S.C. § 1412(a), I must look to the whole of the statute, including § 1412, in deriving the "substantive standards of review" I must employ. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 205–06, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

ecutive officer of a State must develop and implement interagency agreements and reimbursement mechanisms to ensure that educational agencies have access to funding from non-educational public agencies that are responsible for services that are also necessary for ensuring a free appropriate public education to children with disabilities.

A provision is added to the Act to strengthen the obligation to ensure that all services necessary to ensure a free appropriate public education are provided through the coordination of public educational and non-educational programs. This subsection is meant to reinforce two important principles: (1) that the State agency or LEA responsible for developing a child's IEP can look to noneducational agencies, such as Medicaid, to pay for or provide those services they (the non-educational agencies) are otherwise responsible for; and (2) that the State agency or LEA remains responsible for ensuring that children receive all the services described in their IEPs in a timely fashion, regardless of whether another agency will ultimately pay for the services.

H.R.Rep. No. 105–95, at 92, *reprinted in* 1997 U.S.C.C.A.N. 89, 89–90. In short, Congress intended to leverage the resources of other State service-providers on behalf of disabled students. The State Defendants' position, which ultimately produces the result that the Governor of New Jersey has no obligation to ensure any interagency agreements, is also hard to reconcile with Congress' observation that "[t]he chief executive officer of a State

*must* develop and implement interagency agreements...." *Id.* (emphasis added).

I conclude, therefore, that the State Defendants' interpretation of the IDEA (which may or may not be the view held by New Jersey as a whole) is contrary to the clear language of the statute and its legislative history.[14] That leaves the question whether the DDD and DOE, in particular, are responsible for the costs of S.C.'s residential placement.

The IDEA expressly makes agencies such as DDD responsible for arranging to pay expenses such as those alleged by Deptford. According to the statute, where a public agency is obligated under State law to provide any services that are considered "special education or related services ... that are necessary for ensuring a [FAPE] ... such public agency *shall* fulfill that obligation or responsibility, either directly or through contract or other arrangement." 20 U.S.C. § 1412(a)(12)(B)(i) (emphasis added). This language leaves little doubt that DDD is itself responsible for making arrangements to pay local school districts that incur expenses covered under the statute. A residential placement that is "an essential prerequisite for learning" must be considered part of a student's "special education or related services" under IDEA. *Kruelle*, 642 F.2d at 694 & n. 23. I must assume, for the purposes of this 12(b)(6) Motion, that S.C.'s residential placement would meet that standard. Moreover, DDD is obligated under New Jersey law to provide services, including "day care, domiciliary care, [and] special living arrangements" to "eligible developmentally disabled persons." N.J. Stat.

---

**14.** I emphasize the clarity of the statute not because Deptford has any special burden in resisting a Rule 12(b)(6) motion, but because federal courts generally will not read federal statutes to order the affairs of state government in the absence of a clear statement to that effect. *See Gregory v. Ashcroft*, 501 U.S.

452, 460–63, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991).

I also note that then-Judge Wolfson's contrary conclusion, *see L.P.*, 265 N.J.Super. at 276–77, 626 A.2d 473, was reached without benefit of the clarifying 1997 amendments to the IDEA.

Ann. §§ 30:6D–25(f), –27(a) (West 1997); *see also id.* § 6D–42 (West Supp.2002) (requiring the Commissioner of Human Services to submit a plan for eliminating the waiting list for DDD's community residential and day programs). Again, I must assume for present purposes that' S.C. is an eligible person under the statute. DDD, therefore, has failed to fulfill its obligation under § 1412, a fact I must take note of in granting "such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B)(iii); *see also Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034 (holding that a reviewing court's inquiry includes whether "the State [has] complied with the procedures set forth in the Act"); *Mrs. C.,* 916 F.2d at 75–76 (ordering responsible state agencies, along with local school district, to provide compensatory education to disabled child). *But see Bd. of Educ. of Cmty. High Sch. Dist. 218 v. Ill. State Bd. of Educ.,* 979 F.Supp. 1203, 1210 (N.D.Ill.1997).

DOE's responsibility arises a bit more circuitously. As I have noted, the 1997 amendments to the IDEA direct each state's governor, or his or her designee, to ensure that the various state agencies comply with their obligations under § 1412 to enter into interagency agreements, and to make certain that an agreement or "other mechanism" exists for reimbursing local school districts that front the money for services that should be paid for by other public agencies. *See* 20 U.S.C. §§ 1412(a)(12)(A), (B)(ii). Superficially, then, it might appear at first glance that responsibility for the absence of any agreements or mechanisms should fall on the Governor.

Traditionally, however, the IDEA has been interpreted to require a "single line of responsibility," with the buck stopping at the desk of the state educational agency. *See John T. v. Iowa Dep't of Educ.,* 258 F.3d 860, 864 (8th Cir.2001); *St. Tamma-*

*ny,* 142 F.3d at 784–85; *Gadsby,* 109 F.3d at 952–55; *Todd D.,* 933 F.2d at 1583; *Kruelle,* 642 F.2d at 697. When state educational agencies have failed to carry out IDEA-mandated procedures, courts have placed the financial cost of failure squarely on the state agency. *See St. Tammany,* 142 F.3d at 784–85; *Todd D.,* 933 F.2d at 1583; *Kruelle,* 642 F.2d at 696–97. Congress confirmed that it intended the 1997 amendments to strengthen, not undermine, that principle. *See* H.R.Rep. No. 105–95, at 89, *reprinted in* 1997 U.S.C.C.A.N. 89, 89. To divide ultimate responsibility for compliance with the procedures of § 1412 between a governor and his or her state educational agency would only invite the very kind of finger-pointing and blame-dodging that the "single line of responsibility" is intended to prevent. In addition, Congress has not given any money directly to the States' governors to spend on education for the disabled. The governor could therefore only be meaningfully subjected to an injunction, rather than a financial remedy. That would sacrifice a significant advantage of imposing financial responsibility—namely, the flexibility that the state agency would retain to craft its own solution to the procedural failure. *See Kruelle,* 642 F.2d at 697. Therefore, I would presume that, in the absence of any state law to the contrary, the "designee" of the Chief Executive Officer is always the state educational agency, 20 U.S.C. § 1412(a)(12)(A), and impose responsibility on the SEA accordingly.

Thus, to the extent that DDD does not meet its obligations to Deptford under the IDEA, the DOE will be financially responsible for any shortfalls. Put another way, DDD and DOE will be jointly and severally liable for any reimbursements to which Deptford can establish it is entitled. Both share responsibility for crafting a suitable interagency agreement, and are therefore

equally subject to injunctive relief. Accordingly, as there exists some set of facts under which DDD and DOE can be liable to Deptford, I must deny their Motion to Dismiss those claims on which Deptford has standing to sue.

## IV. CONCLUSION

For the reasons set forth above, I shall grant in part and deny in part the Motion of the Third–Party Defendants to Dismiss, pursuant to Fed.R.Civ.P. 12(b)(6). In particular, I will grant the portion of the Motion aimed at Deptford's claims for attorney's fees and other costs incurred opposing S.C.'s Complaint before the ALJ and in this Court. I will deny the Motion in all other respects. The Court will enter an appropriate form of Order.

### ORDER

This matter having come before the Court on the Motion of Third–Party Defendants, New Jersey Department of Education and New Jersey Department of Human Services, Division of Developmental Disabilities, to Dismiss for Failure to State a Claim, pursuant to Fed. R. Civ. P. 12(b)(6), David Samson, Esq., Attorney General of New Jersey, Beth Leigh Mitchell, Esq., Deputy Attorney General, appearing on behalf of the Third–Party Defendants, and James F. Schwerin, Esq., Parker, McCay & Criscuolo, P.A., appearing on behalf of Defendant and Third–Party Plaintiff, Deptford, Township Board of Education, Herbert D. Hinkle, Esq., Law Offices of Herbert D. Hinkle, appearing on behalf of Plaintiffs, C.C. and K.C., on behalf of the minor child, S.C.; and,

The Court having considered the papers submitted by counsel for Third–Party Defendants in support of the Motion and in response to the Court's request for supplemental briefing, and the papers submitted by counsel for Defendant and Third–Party Plaintiff in opposition and in response to the Court's request, and the Plaintiff having declined to submit papers;

For the reasons set fourth in the Opinion entered concurrently with this Order, IT IS, on this 7th day of August, 20002, hereby ORDERED that:

1. The Motion of Third–Party Defendants, New Jersey Department of Education and New Jersey Department of Human Services, Division of Developmental Disabilities, to Dismiss for Failure to State a Claim, pursuant to Fed. R. Civ., P. 12(b)(6), is GRANTED IN PART and DENIED IN PART; and,

2. The Motion of Third–Party Defendants, New Jersey Department of Education and New Jersey Department of Human Services, Division of Developmental Disabilities, to Dismiss for Failure to State a Claim, pursuant to Fed. R. Civ. P. 12(b)(6) is GRANTED as to the Defendant and Third–Party Plaintiffs claims for attorney's fees and other costs incurred in opposing the Plaintiff's Complaint in the New Jersey Office of AdministrativeLaw and in this Court; and,

3. The Motion of Third–Party Defendants, New JerseyDEpartment of Education and New Jersey Department of Human Services, Division of Developmental Disabilities, to Dismiss for Failure to State a Claim, pursuant to Fed. R. Civ. P. 12(b)(6) is DENIED in all other respects.