**S.C., a minor child, by his parents, C.C. and K.C., Plaintiffs,**

v.

**DEPTFORD TOWNSHIP BOARD OF EDUCATION, Defendant,**

**Deptford Township Board of Education, Third–Party and Counterclaim Plaintiff,**

v.

**Department of Education of the State of New Jersey; Department of Human Services, Division of Developmental Disabilities of the State of New Jersey, Third–Party Defendants,**

**S.C., a minor child, by his parents, C.C. and K.C., Counterclaim Defendants.**

**CIVIL ACTION NO. 01–5127.**

United States District Court, D. New Jersey.

March 14, 2003.

Herbert D. Hinkle, Esq., Law Offices of Herbert D. Hinkle, Lawrenceville, NJ, for Plaintiffs, C.C. and K.C., on behalf of the minor child, S.C.

James F. Schwerin, Esq., Parker, McCay & Criscuolo, P.A., Lawrenceville, NJ, for Defendant and Third–Party Plaintiff, Deptford Township Board of Education.

Peter C. Harvey, Esq., Acting Attorney General, Michael Lombardi, Esq., Deputy Attorney General, Trenton, NJ, for Third–Party Defendants, New Jersey Department of Education and New Jersey Department of Human Services, Division of Developmental Disabilities.

## OPINION

ORLOFSKY, District Judge.

This is the second time these parties have appeared before this Court to adjudicate their rights and obligations under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1401–1487 (2003). *See S.C. v. Deptford Township Bd. of Educ.*, 213 F.Supp.2d 452 (D.N.J. 2002). Plaintiff, S.C., a minor child, by his parents, C.C. and K.C., and Defendant, Deptford Township Board of Education ("Deptford"), now cross-move for summary judgment. In addition, Third–Party Defendants, Department of Education of the State of New Jersey ("DOE") and New Jersey Department of Human Services, Division of Developmental Disabilities ("DDD"), move for reargument of issues decided by this Court on August 7, 2002, as reported at *S.C,* 213 F.Supp.2d 452. For the reasons set forth below, S.C.'s motion for summary judgment shall be granted, and Deptford's cross-motion for summary judgment shall be denied. DOE and DDD's motion for reargument shall be denied, but I shall

dismiss DDD from this action on the basis of Eleventh Amendment immunity.

## I. FACTUAL AND PROCEDURAL BACKGROUND

S.C. is an autistic child whose condition poses severe barriers to his ability to learn in an ordinary educational environment. *See* Compl. at ¶ 1. S.C. resides in Deptford Township, a New Jersey municipality. Because New Jersey has accepted funds from the federal government under the IDEA, Deptford's Board of Education is a "local educational agency" as defined in that Act. *See* 20 U.S.C. § 1401(15). That is, the Board is primarily responsible for assuring that S.C. will receive a free appropriate public education, or "FAPE." *Id.* § 1413.

## A. PROCEEDINGS DURING THE DUE PROCESS HEARING BEFORE THE ADMINISTRATIVE LAW JUDGE

In the period immediately preceding the dispute that produced this litigation, S.C. was attending a day program at the Bancroft School, a facility designed to educate students with special needs. Because S.C.'s maladaptive behaviors were increasing and he was regressing academically, S.C.'s parents requested that Deptford place S.C. in a residential program to teach S.C. to control his maladaptive behavior, to reverse S.C.'s academic regression, and to receive an appropriate education. Compl. at ¶¶ 7–9. Deptford denied this request. *Id.* at ¶ 10. In response, S.C. and his parents filed a petition for a due process hearing with the New Jersey Department of Education, pursuant to 20 U.S.C. § 1415(i) and N.J. Admin. C. § 6A:14–2.7. Compl. at ¶ 11.

A due process hearing was held in April and May of 2001 before the New Jersey Office of Administrative Law. *Id.* at §§ 11–12. On August 21, 2001, Administrative Law Judge ("ALJ") Joseph Fidler issued his final decision, in which he found that:

(1) the school district had not met its burden of showing, by a preponderance of the credible evidence, that it had offered an appropriate Individual Education Plan ("IEP") to S.C.;

(2) S.C. was not receiving a meaningful educational benefit at Bancroft as a day student; and

(3) the credible evidence demonstrated that S.C. required a residential placement of the sort provided by the Lindens program at the Bancroft School.

*See C.C. AND K.C. ON BEHALF OF S.C. v. DEPTFORD TOWNSHIP BD. OF EDUC.*, Dkt. No. EDS 2069–01, 2001 WL 1023461, at 9–10 (N.J. Adm. Aug. 21, 2001). Judge Fidler ordered Deptford to prepare an appropriate IEP for S.C. in accordance with his findings. *Id.* No party to the due process hearing questioned whether any state entity other than Deptford would pay for S.C.'s residential placement, and the ALJ did not address that issue.

## B. PREVIOUS PROCEEDINGS BEFORE THIS COURT

After Deptford failed, in the view of S.C.'s parents, to implement Judge Fidler's Order, S.C. and his parents filed a Complaint on October 25, 2001, asking this Court to enforce the ALJ's Order. Deptford, in turn, filed a cross-motion for a stay of the ALJ's decision on November 28, 2001. On December 3, 2001, Deptford answered S.C.'s Complaint and filed a counterclaim challenging the ALJ's findings.

On December 7, 2001, I heard oral argument on S.C.'s motion to enforce, and Deptford's cross-motion to stay, Judge Fidler's final decision and order. On that same date, I held that preliminary injunctive relief was warranted under the "stay put" provision of the IDEA, 20 U.S.C.

§ 1415(j)[1], and I issued an Order compelling Deptford to comply with the ALJ's final decision and order pending further order of this Court. *See* Order, *S.C. v. Deptford Board of Educ.*, Civ. A. No. 01–5127 (D.N.J. Dec. 7, 2001).

Along with its Answer, Deptford also filed a Third–Party Complaint against DOE and DDD. According to Deptford, DOE and DDD are obligated, under the IDEA, to pay for at least the residential portion of S.C.'s education. Deptford also alleges in its Third–Party Complaint that DOE and DDD have failed to enter into an "interagency agreement" to provide for DDD's provision of services to students who require them in order to receive a FAPE.

On March 14, 2002, the State Defendants filed a Motion to Dismiss Deptford's Third–Party Complaint for failure to state a claim. In the course of resolving that Motion, I determined that this Court may lack subject matter jurisdiction to hear the Third–Party Complaint. Accordingly, on April 16, 2002, I sent a letter to the parties asking for supplemental briefing on the question of this Court's subject matter jurisdiction. The parties promptly filed their additional briefs.

In an Opinion and Order filed August 7, 2002, I held that Deptford had standing to sue DOE and DDD, and that these two state agencies were jointly and severally liable for any reimbursements to which Deptford could establish it was entitled. *S.C.*, 213 F.Supp.2d at 466. I granted DOE and DDD's motion to dismiss on the limited issue of attorney's fees and held that neither agency is responsible for Deptford's costs and attorney's fees incurred in opposing S.C.'s Complaint in the New Jersey Office of Administrative Law and in this Court. *Id.* at 467. I denied DOE and DDD's motion in all other respects. *Id.*

## C. THE PENDING MOTIONS

S.C. and Deptford now cross-move for summary judgment, pursuant to Fed. R. Civ. 56. S.C. contends that the Court should grant summary judgment in his favor because the record unequivocally establishes that he requires residential placement in order to benefit from a FAPE. In response, Deptford claims that residential placement is not required or justified because S.C. is able to receive a meaningful education without such placement.

In addition, DOE and DDD again argue that the IDEA does not create a cause of action under which Deptford may sue them and have asked this Court to reconsider its August 7, 2002 Opinion and Order. DDD further contends that it "is not involved in the IDEA system and is not an appropriate party to this litigation." *See* Br. in Supp. of Mot. for Rearg., at 12. In their brief in support of reargument, DOE and DDD have raised, for the first time in this action, the defense of sovereign immunity, *see id.* at 14, and asserted a broad challenge to the constitutionality of the IDEA itself, *id.* at 24. As an alternative to their motion for reargument, DOE and DDD seek leave to certify, for interlocutory appeal to the United States Court of Appeals for the Third Circuit, pursuant to 28 U.S.C. § 1292(b), the question of whether DDD[2] can be ordered to provide FAPE

---

1. The "stay put" provision provides: "[D]uring the pendency of any proceedings conducted pursuant to this section ... the child shall remain in the then-current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed." 20 U.S.C. § 1415(j).

2. DOE, however, has not moved for reargument on its obligation to provide a FAPE under the IDEA. Only DDD contests this Court's finding of its joint and several liability for S.C.'s residential educational placement

services under the IDEA. *Id.* at 32. Finally, DOE and DDD seek "a stay of all matters related to the State in this litigation until the State's immunity contentions are fully resolved." *Id.* at 34.

This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (2003). I have considered the submissions of the parties and decided these motions on the papers without oral argument pursuant to Fed R. Civ. P. 78 (2003).

## II. MOTION FOR SUMMARY JUDGMENT

### A. THE LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

The legal standard governing summary judgment is well-settled. Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Consol. Rail Corp. ("Conrail"),* 297 F.3d 242, 247 (3d Cir. 2002). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Conrail,* 297 F.3d at 247 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is material if it bears on an essential element of the plaintiff's claim. *Abraham v. Raso,* 183 F.3d 279, 287 (3d Cir.1999) (*citing Anderson,* 477 U.S. at 248–251, 106 S.Ct. 2505).

Thus, to survive a motion for summary judgment, the party contesting the motion must demonstrate a dispute over facts that might affect the outcome of the suit. *Groman v. Township of Manalapan,* 47 F.3d

under the IDEA. *See S.C.,* 213 F.Supp.2d at

628, 633 (3d Cir.1995) (*citing Anderson,* 477 U.S. at 250–52, 106 S.Ct. 2505). When considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. In evaluating the evidence, the court must "view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." *Curley v. Klem,* 298 F.3d 271, 276–77 (3d Cir.2002) (quoting *Bartnicki v. Vopper,* 200 F.3d 109, 114 (3d Cir.1999)); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Notwithstanding this deference towards the non-movant, "[t]he mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient" to defeat a motion for summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

Summary judgment is proper if, after adequate time for discovery and upon motion, a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Conrail,* 297 F.3d at 247 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

After one party has filed a properly supported summary judgment motion, the party opposing it must present sufficient evidence for a reasonable jury to find in its favor. *Groman,* 47 F.3d at 633 (*citing Anderson,* 477 U.S. at 250–52, 106 S.Ct. 2505). Moreover, "[w]hen a motion for summary judgment is made and supported . . . an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth

464–67 (citing 20 U.S.C. § 1412(a)(12)(B)).

specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).[3] "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." *Id.*

## B. WHETHER SUMMARY JUDGMENT SHOULD BE GRANTED IN THIS CASE

### 1. History of the IDEA

Congress enacted the IDEA in 1975 for the purpose of assuring that "all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(c). *See also Bd. of Educ. v. Rowley*, 458 U.S. 176, 179, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 755–56 (3d Cir.1995); *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1213 (3d Cir.1993); *Kruelle v. New Castle County Sch. Dist.*, 642 F.2d 687, 690–91 (3d Cir.1981). In order to receive federal funding under the IDEA, states must comply with federal guidelines and regulations established to ensure that children with disabilities[4] receive a "free appropriate public education" ("FAPE").[5] The United States Supreme Court has held that a FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley*, 458 U.S. at 189, 102 S.Ct. 3034. More specifically, states are required to develop for each handicapped child an "individualized education program" ("IEP"), which consists of "a detailed written statement arrived at by a multi-disciplinary team summarizing the child's abilities, outlining the goals for the child's education, and specifying the services the child will receive." *Oberti*, 995 F.2d at 1213 n. 16 (quoting *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 180–85 (3d Cir.1988)). The IEP must be reviewed and revised annually by the local educational agency. *See* 20 U.S.C. § 1401(a)(5).[6] As a procedural

---

**3.** Local Civil Rule 56.1 of this Court also requires that on motions for summary judgment each side must submit statements identifying material facts as to which there does or does not exist a genuine issue. "[F]acts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted." *Hill v. Algor*, 85 F.Supp.2d 391, 408 n. 26 (D.N.J.2000).

**4.** The term "child with a disability" includes a child "with mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance ..., orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities," 20 U.S.C. § 1401(3)(A)(i), and "who, by reason thereof, needs special education and related services," *id.* § 1401(3)(A)(ii) (West 2003).

**5.** The term "free appropriate public education" means special education and related services that—

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary, or secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(8).

**6.** The New Jersey statutory scheme "provides for initial evaluation and classification of a child by a 'child-study team,' consisting of a school psychologist, a learning disabilities teacher-consultant, and a school social worker." *D.B. v. Ocean Township Board of Educ.*, 985 F.Supp. 457, 471 (D.N.J.1997) (citing N.J.S.A. §§ 18A:46–1 *et seq.*). "The child-study team determines whether a child is eligible for special education, then develops, monitors, and evaluates the child's IEP. Par-

safeguard, parents who are not satisfied with their child's IEP are entitled to an "impartial due process hearing." *See* 20 U.S.C. § 1415(b), (d). Whenever possible, the IDEA requires the education of handicapped children with non-handicapped children, a concept known as "mainstreaming." *W.B. v. Matula,* 67 F.3d 484, 492 (3d Cir.1995).

Recognizing the apparent tension between the IDEA's goals to mainstream handicapped children and to provide them "individualized programs tailored to the specific needs of each child," the United States Court of Appeals for the Third Circuit has articulated three factors which a District Court should consider in determining the appropriate placement of a handicapped child:

(1) the steps that the school has taken to include the child in the regular classroom;

(2) a comparison between the educational benefits the child will receive in a regular classroom versus the benefits the child will receive in a more restricted environment; and

(3) the possible negative effect the child's inclusion in the regular classroom will have on the other children in that classroom.

*Oberti,* 995 F.2d at 1214–17. Moreover, the Third Circuit has acknowledged that residential placement, although not preferred, is required once a court has concluded that it is the "only realistic option" for a handicapped child's learning improvement. *Kruelle v. New Castle County Sch. Dist.,* 642 F.2d 687, 695 (3d Cir.1981).[7]

## 2. The Legal Standard of Review of ALJ Decisions Under the IDEA

In considering whether to grant S.C.'s motion for summary judgment, and thereby grant permanent injunctive relief, I must first determine the proper weight to accord the decision of the ALJ. "[J]udicial review in IDEA cases differs substantially from judicial review of other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." *Susan N. v. Wilson Sch. Dist.,* 70 F.3d 751, 757 (3d Cir.1995) (quoting *Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1471 (9th Cir.1993)). In *Rowley,* the Supreme Court announced a distinctive standard of review which federal courts must apply when reviewing an ALJ's decisions under the IDEA:

[B]as[ing] its decision on the "preponderance of the evidence," is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at naught. The fact that § 1415(e) requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement *that due weight shall be given to these proceedings.* And we find nothing in the Act to suggest that merely because Congress was rather sketchy in establishing substantive requirements, as op-

---

ents have the right to be involved in the formation of the IEP, and the team must meet with the parents in developing the IEP for the child." *Id.* (internal citations omitted).

**7.** Applying the IDEA and N.J.S.A. § 6:28–4.2(a), the New Jersey Supreme Court has

also recognized that "for some children residential placement in a boarding school may be the only way for them to receive an appropriate education." *Lascari v. Board of Educ.,* 116 N.J. 30, 36, 560 A.2d 1180, 1183 (1989).

posed to the procedural requirements for the preparation of an IEP, it intended that reviewing courts should have a free hand to impose substantive standards of review which cannot be derived from the Act itself. In short, the statutory authorization to grant "such relief as the court deems appropriate" cannot be read without reference to the obligations, largely procedural in nature, which are imposed upon recipient States by Congress.

*Rowley*, 458 U.S. at 206, 102 S.Ct. 3034 (emphasis added). Courts applying the "due weight" standard established in *Rowley* have struggled with the determination of "how much weight is 'due.'" *Susan N.*, 70 F.3d at 757. The Third Circuit, adopting the standard of review established by the United States Court of Appeals for the First Circuit, has held that:

> [T]he question of the weight due the administrative findings of fact must be left to the discretion of the trial court. The traditional test of findings being binding on the court if supported by substantial evidence, or even a preponderance of the evidence, does not apply. This does not mean, however, that the findings can be ignored. The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole.

*Susan N.*, 70 F.3d at 758.

■ Therefore, when applying the "due weight" standard in suits brought under the IDEA, a federal court should conduct a twofold inquiry:

> First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to en- able the child to receive educational benefits? If these requirements are met, the State has complied with its obligations imposed by Congress and the courts can require no more.

*Rowley*, 458 U.S. at 206, 102 S.Ct. 3034.

Because there is no evidence in the summary judgment record that Deptford has failed to comply with the procedures set forth in the IDEA, nor has S.C. raised such an argument, my inquiry is limited to the second question under *Rowley*— whether the IEP developed by Deptford is reasonably calculated to enable S.C. to receive a FAPE. If a genuine issue of material fact exists as to this question, I cannot grant the motion of either party for summary judgment. After conducting a complete review of the testimony and evidence presented at the hearings before the ALJ in April and May, 2001, for the reasons set forth below, I conclude that Judge Fidler's finding that S.C. should be placed in a residential program is entitled to due weight and shall be affirmed by this Court. I shall now consider the arguments made on behalf of both parties on their cross-motions for summary judgment.

### 3. Whether S.C. Requires Residential Placement As Part of a FAPE

■ S.C. contends that no genuine issue of material fact exists because—apart from the testimony of Raymond Sherman ("Sherman"), the Deptford Special Services Director, who testified that S.C. was receiving an appropriate education in the Bancroft Day Program, *see C.C. and K.C. on Behalf of S.C.*, OAL Dkt. No. Eds.2069–01, Tr. 25:15–25, 26:1–2, 44:1–4, 45:15–25 (Apr. 11, 2001)—the summary judgment record contains uncontested evidence that S.C. will only receive a meaningful education through residential placement. *See id.* at Tr. ¶ 60 (May 14, 2001) (reconstructed testimony of Dr. David Holmes). Spe-

cifically, S.C. contends that at the hearing before the ALJ, the only witness with expertise in the education of children with autism, David L. Holmes, Ed.D. ("Holmes"), testified that S.C.'s January 2001 IEP, which recommended continued placement in the Bancroft Day School, was not appropriate. *Id.* at Tr. ¶ 66. Rather, in order to receive a meaningful education, Holmes testified that S.C. required a program which administered a regimen of behavior modification twenty-four hours a day. *Id.* at Tr. ¶ 67. If left in a day program, Holmes felt that S.C. would continue to regress academically. *Id.* at Tr. ¶ 58.

In addition to the expert testimony of Holmes, who had met with S.C. on several occasions, S.C. relies on the testimony of the remaining witnesses, some of whom dealt with S.C. on a daily basis. First, the testimony of S.C.'s mother, K.C., and Elizabeth Hutchinson ("Hutchinson"), a teacher at the Bancroft Day School, paint a picture of a child whose frequent aggressive outbursts at school and home have caused them to alter S.C.'s environment significantly, to the point that he is unable to advance academically.[8] Moreover, Janet Ulrich ("Ulrich"), who is employed by Deptford as a learning disability consultant and who participated in the development of S.C.'s January 2001 IEP,[9] testified

that because he was not making academic progress at Bancroft, a "[r]esidential program could be helpful for S.C." *Id.* at Tr. 148:1 (April 11, 2001). Finally, Christina Schoener ("Schoener"), the case manager of the Deptford Study Team, testified that despite the fact that S.C. displayed academic potential—as demonstrated by his I.Q. score which denoted only mild to moderate retardation—S.C. was functioning academically and behaviorally at only one-tenth of one percent of his age group, the "very lowest" percentile possible. *Id.* at Tr. 206–09 (May 10, 2001). His severe behavioral problems, according to Schoener, were interfering with his ability to progress in all areas of education. *Id.* at Tr. 204:5–9.[10]

S.C. asks this Court to accord little weight to the testimony of Sherman, who had not met with and observed S.C. since 1999. *Id.* at Tr. 49:3–11 (April 11, 2001). Sherman testified that S.C.'s educational needs were being met by the Bancroft Day Program, and moreover, that Deptford was not legally obliged to fund residential placement for a disabled child who displayed severe behavioral problems in the home. *Id.* at Tr. 25–26, 44–45. S.C. contends that "Sherman's testimony that [S.C.] was making progress at Bancroft is not only at odds with the opinion of everyone with whom [S.C.] has had contact, but

8. Specifically, Hutchinson testified that S.C. was unable to participate in a number of educational activities because of his sudden and violent physical attacks, which endangered everyone in S.C.'s vicinity. *C.C. and K.C. on Behalf of S.C.,* OAL Dkt. No. Eds. 2069–01, Tr. 78:9–25 (May 10, 2001). Moreover, she stated that S.C. has made no progress in all academic areas, and she repeats the same exercises with him from day to day. *Id.* at Tr. 151:2–20.

9. Ulrich testified that when S.C. was tested for academic achievement in 2001 in the areas of basic reading, mathematics, listening and reading comprehension, spelling, and

oral expression, his results were among the lowest that she had ever seen. *C.C. and K.C. on Behalf of S.C.,* OAL Dkt. No. Eds.2069–01, Tr. 129–31 (April 11, 2001).

10. S.C. also relies on the report of Education Consultant, Todd A. Harris, Ph.D. *See id.* at BOE Ex. 5. Dr. Harris was hired by Sherman to observe S.C. in his educational setting, review his file, and suggest how to most appropriately address his behavioral problems. *Id.* Dr. Harris recommended as follows: "Given the intensity and frequency of [S.C.'s] aggressive behaviors, [S.C.] should receive residential services." *Id.*

it is contradicted by the February 2001 Bancroft progress report upon which he relied to reach this conclusion." Br. in Supp. of Pl.'s Mot. for Summ. J. at 25 ("Pl.'s Br.").

It is upon this very testimony, however, which Deptford relies in arguing that it is not required under the IDEA to place S.C. in a residential program. *See* Def.'s Br. in Supp. of Cross–Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Br."), at 3. Deptford contends that it is the DDD's responsibility to address and reform the non-educational aspects of S.C.'s behavioral problems, which, according to Sherman, provide little interference with S.C.'s ability to progress academically. *Id.* at 6. Moreover, Deptford argues that placing S.C. in a residential program will be at odds with the IDEA's "strong preference for mainstreaming," in other words, placing a child in the least restrictive learning environment. *Oberti,* 995 F.2d at 1214.

■ Deptford asks this Court to follow the rationale adopted by my colleague, Judge Cooper (formerly Parell), in *D.B. v. Ocean Township Bd. of Educ.,* 985 F.Supp. 457 (D.N.J.1997). In *D.B.,* Judge Cooper reversed the ALJ's ruling, which placed the plaintiff in a residential program. Reasoning that residential placement of the plaintiff would not be necessary for primary educational purposes, Judge Cooper applied the three-factor test established by the Third Circuit in *Oberti, supra.* She included six more factors, however, which she considered relevant in making the determination of whether to place a handicapped child in a more restrictive environment. Those factors include:

(1) whether the child was experiencing emotional conditions that fundamentally interfered with the child's ability to learn in local placement;

(2) whether the child's behavior was so inadequate, or regression was occurring to such a degree, as to fundamentally interfere with the child's ability to learn in a local placement;

(3) whether, before the dispute arose [between the parents and the local school board], any health or educational professionals actually working with the child concluded that the child needed residential placement;

(4) whether the child had significant unrealized potential that could only be developed in residential placement;

(5) whether past experience [with placing the child in a more restrictive environment] indicated a need for residential placement; and

(6) whether the demand for residential placement was primarily to address educational needs.

*D.B.,* 985 F.Supp. at 493–97.

Applying these factors to this case, Deptford contends that S.C.'s circumstances are no different than the circumstances of R.H., the handicapped child in *D.B.* who suffered from severe mental retardation. Accordingly, it contends that this Court should reach the same conclusion reached by Judge Cooper—that residential placement is not required in order for S.C. to receive a FAPE under the IDEA.

I disagree, however, and conclude that S.C.'s case is distinguishable from the case of *D.B.* Unlike R.H., whose severe mental retardation prevented her from accomplishing even the most basic of tasks, such as toileting, S.C. suffers from severe behavioral problems that negatively impact, and in some instances preclude, his ability to participate in educational activities that are well within his mental and physical capabilities. Whereas Judge Cooper found that residential placement would not offer R.H. a realistic chance at improving her life skills, *see D.B.,* 985 F.Supp. at 523–24,

the summary judgment record in this case contains uncontested evidence that S.C. shows potential for academic advancement in an environment with twenty-four-hour-a-day behavior modification. *See C.C. and K.C. on Behalf of S.C.*, OAL Dkt. No. Eds.2069–01, Tr. ¶¶ 67–73 (May 14, 2001) (reconstructed testimony of Holmes).

Moreover, although I am not required to consider the additional six factors adopted in *dicta* by the *D.B.* court, I find that all the factors listed by the courts in both *Oberti* and *D.B.* weigh overwhelmingly in favor of placing S.C. in a residential program. First, the Bancroft Day School has taken substantial steps to include S.C. in its academic program. Hutchinson testified that she has focused her efforts intensively on S.C. In fact, S.C. receives one-on-one instruction for every academic exercise in which he participates. *C.C. and K.C. on Behalf of S.C.*, OAL Dkt. No. Eds.2069–01, Tr. 134–46 (May 10, 2001). Deptford has also sent a behavior specialist to S.C.'s home to work with S.C. and his family to minimize and reform his aggressive outbursts. *Id.* at Tr. 70–73 (Apr. 11, 2001). Although these efforts provided some temporary relief, S.C. continued to engage in activities that prevented him from attending gym class and participating in class outings and field trips. *Id.* at Tr. 70–73109–110 (May 10, 2001). Additionally, Hutchinson testified that, rather than risk a sudden and violent attack from S.C., she would not confront S.C. with new or challenging academic tasks, and she would permit him to isolate himself from a significant portion of classroom activities. *Id.* at Tr. 59–60, 68, 71, 124, 151.[11] The result—although seemingly successful in controlling his aggressive outbursts—has prevented him from academic advancement. Indeed, the summary judgment record re-

veals that over the last five to six years, S.C. has regressed in all academic areas.

A comparison of the educational benefits S.C. has received in a regular classroom with the benefits which he may receive in a residential program leads to the conclusion that S.C. is best suited for residential placement. As discussed above, S.C. has regressed in a day program, and Deptford has not pointed to any evidence in the summary judgment record indicating that S.C.'s academic regression cannot be reversed with the type of behavior modification that residential placement will provide. Rather, Holmes' testimony, which I find persuasive, clearly established that S.C., a child with only mild to moderate mental retardation, has not and will not receive a meaningful education at the Bancroft Day School:

> In my professional opinion, to [a] reasonable degree of certainty, S. is now not receiving an appropriate education. He isn't garnering any benefit. His potential is not being tapped. . . .
>
> S.'s prognosis for learning would be exponentially greater if he has a 24 hour placement. . . .
>
> For S., he must learn socialization skills, and he'll achieve many of them in a 24 hour setting but won't in a day placement. The consistencies between class and residence staff help achieve this. They'll challenge S., and there may be more aggression at first, but they'll eliminate that.
>
> S. has few freedoms now, and has narrow opportunities. He needs more adaptive behaviors to be more productive. Without residential [placement], S. will be totally uncontrollable in 2 or 3 years, and will be on medications and institutionalized. . . .

---

11. Holmes further testified that: "[The staff is] very concerned about placing demands on S., because if he isn't receptive, it leads to an assaultive situation." *Id.* at Tr. ¶ 41 (May 14, 2001) (reconstructed testimony).

*Id.* at Tr. ¶¶ 67, 71–73 (May 14, 2001) (reconstructed testimony).

Finally, S.C.'s inclusion in the day program at Bancroft has had a negative effect on the other children in the same classroom. Not only does the summary judgment record establish that S.C. poses a physical danger to the other students, but it confirms that S.C. requires the constant, undivided attention of either Hutchinson or one of her three aides, which, of necessity, reduces the attention that the other students receive. Accordingly, Deptford's refusal to place S.C. in an environment more appropriately designed to modify his behavior is a disservice not only to S.C., but to his classmates as well.[12]

Based on the three factors set forth in *Oberti,* I find that in order to receive a FAPE, S.C. requires placement in a residential program. After according the well-reasoned decision of the ALJ "due weight" and conducting an independent review of the evidence and testimony presented in the hearing before the ALJ, I conclude that reasonable minds could not differ as to whether the preponderance of the evidence weighs in favor of S.C. receiving such placement. All but one witness who testified before the ALJ believed that S.C. was not showing any academic progress, and, thus, was not receiving a meaningful education in the Bancroft Day School. And all but one witness concurred that S.C. could academically improve in the more restrictive environment of a residential program. I find particularly persuasive the testimony of Holmes, S.C.'s expert on the education of children with autism. Accordingly, I shall grant Plaintiffs' motion for summary judgment and the declaratory relief sought under the IDEA, and I shall deny Deptford's cross-motion for summary judgment.

## III. MOTION FOR RECONSIDERATION

### A. THE LEGAL STANDARD GOVERNING MOTIONS FOR RECONSIDERATION

The Federal Rules of Civil Procedure do not expressly recognize motions for "reconsideration." *See United States v. Compaction Sys. Corp.,* 88 F.Supp.2d 339, 345 (D.N.J.1999). Instead, such motions are treated as motions to alter or amend judgment, under Fed.R.Civ.P. 59(e), or as motions for relief from judgment or order, under Fed.R.Civ.P. 60(b). *Id.* (citation omitted); *see also* Allyn Z. Lite, *New Jersey Federal Practice Rules* 26 (Gann 2002). In this District, however, a motion for reconsideration is often referred to as a motion for reargument and is governed by Rule 7.1(g) of the Local Civil Rules. *See id.; see also In re Consol. Parlodel Litig.,* 22 F.Supp.2d 320, 329 (D.N.J.1998) (Orlofsky, J.).

■■■ A motion for reargument must present "matters or controlling decisions which counsel believes the Judge or Mag-

---

12. The remaining factors set forth in *D.B.* also establish that ALJ Fidler correctly concluded that in order to fulfill the requirements of the IDEA, S.C. belonged in a residential program. Specifically, S.C. was clearly experiencing emotional and behavioral conditions that fundamentally interfered with his ability to learn in local placement. Moreover, the summary judgment record establishes that S.C.'s behavior was so inadequate and regression had occurred to such a degree, as to fundamentally interfere with his ability to learn in the Bancroft day program. Deptford contends that the demand for residential placement was not primarily to address educational needs, but rather to address behavioral problems in the home. Hutchinson's testimony, however, confirms that S.C. presented significant behavioral problems at school, which precluded him from participating in educational activities, in addition to preventing Bancroft staff from introducing new stimuli to S.C. in any academic area.

istrate Judge has overlooked." L. Civ. R. 7.1(g); *see also United States v. Omega Inst., Inc.*, 25 F.Supp.2d 510, 513 (D.N.J. 1998). It is improper on a motion for reconsideration to ask the Court to rethink what it has already thought through, whether rightly or wrongly. *See Hatco Corp. v. W.R Grace & Co.—Conn.*, 849 F.Supp. 987, 990 (D.N.J.1994) (quotations and citations omitted). Mere disagreement with a decision of the district court should normally be raised through the appellate process and is inappropriate on a motion for reargument. *See Parlodel*, 22 F.Supp.2d at 329 (citing *Bermingham v. Sony Corp.*, 820 F.Supp. 834, 859 n. 8 (D.N.J.1992)).

■ Courts have recognized three major grounds which may justify reconsideration of an earlier judgment: (1) an intervening change in the controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent injustice. *See Mutual Life Ins. Co. of N.Y. v. Pointe Tapatio Resort Props. No. 1 Ltd. P'ship*, 206 F.R.D. 495, 497 (D.Ariz. 2002); *see also Whitlock Packaging Corp. v. Diversified Sys., Inc.*, 59 F.Supp.2d 384, 389 (D.N.J.1998).

■ Reconsideration of a judgment after its entry is an extraordinary remedy and is only to be granted sparingly. *See Damiano v. Sony Music Entm't, Inc.*, 975 F.Supp. 623, 634 (D.N.J.1996). A mere recapitulation of the cases and arguments considered by the court before rendering the original decision fails to carry the moving party's burden. *See Hatco*, 849 F.Supp. at 990. A motion for reconsideration may not be used to expand the record

before the court, *see Parlodel* at 329, and there is a strong policy against entertaining motions for reconsideration based on evidence that was readily available at the time the original motion was heard, *see Damiano* at 634; *Hatco* at 990. The court has the discretion to accept or reject such extant evidence offered to support a motion for reconsideration. *See Omega*, 25 F.Supp.2d at 513.

## B. WHETHER REARGUMENT IS WARRANTED IN THIS CASE

With the exception of the newly raised Eleventh Amendment immunity defense, DOE and DDD have not presented any new issues, controlling facts or dispositive cases that have not already been considered by this Court in its previous ruling. DOE and DDD's mere disagreement with this Court's decision should be raised through the appellate process and is not appropriate on a motion for reargument. *See Parlodel*, 22 F.Supp.2d at 329; *Hatco*, 849 F.Supp. at 990. Likewise, neither DOE nor DDD has introduced any new, previously unavailable evidence. *See Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.*, 680 F.Supp. 159, 162 (D.N.J. 1988). To the contrary, because this Court's decision was based on the testimony heard by ALJ Fidler, this Court's previous rulings were informed by a well-developed factual record. Thus, I decline DOE and DDD's invitation to revisit my earlier decision, in which I determined that Deptford has standing to bring a Third-Party Complaint against DOE and DDD, and I shall deny the motion for reargument.[13]

---

13. In correspondence to the Court dated Sept. 26, 2002, Deputy Attorney General Michael Lombardi explained that the State's motion to dismiss had not been docketed, at the request of the Clerk of Court, pending this Court's decision on the motion for reargument. Because the motion for reargument shall be denied, I shall direct the Clerk to docket the State's Notice of Motion to Dismiss and treat DOE and DDD's sovereign immunity argument as a motion to dismiss for lack of subject matter jurisdiction, pursuant to Fed. R.Civ.P. 12(b)(1).

## C. WHETHER DOE AND DDD ARE ENTITLED TO ASSERT THE DEFENSE OF SOVEREIGN IMMUNITY UNDER THE ELEVENTH AMENDMENT

DOE and DDD argue that they are entitled to assert the defense of sovereign immunity under the Eleventh Amendment, which provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. The United States Supreme Court has interpreted the Eleventh Amendment to bar suits against States by their own citizens in addition to suits by citizens of other States. *See Bd. of Trustees of Univ. of Alabama v. Garrett,* 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). State agencies, likewise, are generally entitled to Eleventh Amendment immunity. *See Mitchell v. Comm'n on Adult Entm't Establishments of State of Del.,* 12 F.3d 406, 408 (3d Cir.1993) (citing *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)).

### 1. Timeliness of the Assertion of the Sovereign Immunity Defense

■ DOE and DDD have raised an Eleventh Amendment immunity defense,[14] for the first time in this action, in their brief in support of the motion for reargument. Because an Eleventh Amendment immunity defense has jurisdictional[15] attributes, it may be raised at any stage of the proceedings, and may even be raised for the first time on appeal. *See Calderon v. Ashmus,* 523 U.S. 740, 745 n. 2, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998); *United States v. Bein,* 214 F.3d 408, 412 (3d Cir. 2000); *Sutton v. Utah State Sch. for Deaf & Blind,* 173 F.3d 1226, 1231 (10th Cir. 1999).

■ Although the State may raise sovereign immunity at any time, this does not necessarily mean that such immunity will be established. A State may waive the defense of sovereign immunity through voluntary appearance and participation in litigation. *See Clark v. Barnard,* 108 U.S. 436, 447–48, 2 S.Ct. 878, 27 L.Ed. 780 (1883); *College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 131 F.3d 353, 365 (3d Cir.1997), *aff'd,* 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). In determining whether there has been a waiver of sovereign immunity, courts have examined the extent to which a state has participated in the lawsuit and

**14.** Frequently used interchangeably, the "sovereign immunity" defense and the "Eleventh Amendment" defense derive from different sources. As the United States Supreme Court clarified in *Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999):

> We have, as a result, sometimes referred to the States' immunity from suit as "Eleventh Amendment immunity." The phrase is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment. Rather, as the Constitution's structure, its history, and the au-

thoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today.

*Id.* at 713, 119 S.Ct. 2240.

**15.** "Quasi-jurisdictional" may be a more appropriate description, as it is still unclear whether Eleventh Amendment immunity is a matter of subject matter jurisdiction. *See* 17A James Wm. Moore, Moore's Federal Practice § 123.20[1] (3d ed.2002) (citing *Wisc. Dep't of Corrs. v. Schacht,* 524 U.S. 381, 391–393, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998)).

whether it has defended the case on its merits. *Id.,* 131 F.3d at 365.

■ S.C. argues that DOE and DDD waived any immunity from suit by failing to raise sovereign immunity in the first instance and defending the case on the merits.[16] There is no doubt that DOE and DDD could have raised a sovereign immunity defense much earlier in this litigation. Deptford filed its Third–Party Complaint on December 3, 2001, and, in response, DOE and DDD filed a notice of motion to dismiss the Third–Party Complaint, pursuant to Fed.R.Civ.P. 12(b)(6), on March 14, 2002. I decided DOE and DDD's motion to dismiss in an Opinion and Order filed on August 7, 2002. At no time did either DOE or DDD raise sovereign immunity as a defense. This failure to raise sovereign immunity in its first motion to dismiss is somewhat mitigated by the fact that neither DOE nor DDD has filed an Answer to the Third–Party Complaint, nor has there has been extensive discovery on the IDEA funding issue. Thus, although DOE and DDD's delay in raising Eleventh Amendment immunity teeters precariously on the edge of conduct demonstrating waiver, I find that DOE and DDD have not waived sovereign immunity in this case based on their participation in the litigation.

### 2. Limitations on Congressional Abrogation of Sovereign Immunity

■ Congress may abrogate a State's immunity pursuant to the enforcement provisions found in Section Five of the Fourteenth Amendment. *See College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). This power, however, is limited to the enactment of remedial statutes designed to

redress unconstitutional actions. *See City of Boerne v. Flores,* 521 U.S. 507, 519, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). "There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to their end." *Id.* at 520, 117 S.Ct. 2157. Prior to abrogating the States' immunity from suit in federal court, Congress must make its intention unmistakably clear in the language of the statute. *See Dellmuth v. Muth,* 491 U.S. 223, 230, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989).

■ The IDEA, which contains an express waiver of immunity, clearly meets the clear-language requirement:

A State shall not be immune under the eleventh amendment to the Constitution of the United States from suit in Federal court for a violation of this chapter.

20 U.S.C. § 1403(a); *see also Beth V. v. Carroll,* 87 F.3d 80, 88 (3d Cir.1996) ("1989 amendment to IDEA ... makes express its abrogation of the states' Eleventh Amendment immunity from suit."). The IDEA's statutory history is comparable to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, which the United States Supreme Court once held did not contain "the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 246, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). In response to the Supreme Court's ruling, Congress amended the statute in order to abrogate state immunity explicitly: "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973." 42 U.S.C.

---

**16.** The State, too, is aware of its temporal shortcoming in raising a sovereign immunity defense: "Although the State did not argue this point in its initial briefs to the Court, the State asks this Court to take judicial notice of the State's immunity." DOE & DDD's Br. in Supp. of Reargument, at 13.

§ 2000d–7(a)(1) (West 2003). The Supreme Court later reviewed this amended abrogation language and confirmed that Congress had crafted an unambiguous waiver of the States' Eleventh Amendment immunity. *See Lane v. Pena*, 518 U.S. 187, 200, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996); *Koslow v. Commonwealth of Pa.*, 302 F.3d 161, 170 (3d Cir.2002). The IDEA's abrogation language, 20 U.S.C. § 1403(a), is substantially similar to the amended abrogation language of the Rehabilitation Act, and I find that it, too, constitutes unequivocal abrogation language. As the United States Court of Appeals for the Seventh Circuit observed, "[l]anguage this direct satisfies the clear-statement requirement." *Bd. of Educ. of Oak Park and River Forest High Sch. Dist. No. 200 v. Kelly E.*, 207 F.3d 931, 935 (7th Cir. 2000) (finding that State waived Eleventh Amendment immunity by accepting funds under IDEA).

Broadly attacking the constitutionality of the IDEA, DOE and DDD argue that the statute exceeds Congress' legislative authority because it is not limited to remedying past constitutional violations against students with disabilities. In making this argument, DOE and DDD have a high hurdle to overcome. *See Reno v. Condon*, 528 U.S. 141, 147, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000) (federal statutes are presumed constitutional). They have not met this burden. Two of my colleagues in this District have already addressed this issue and found that the IDEA does not exceed the scope of congressional authority. In an unreported decision, *F.P. & M.P. v. State of New Jersey*, Civ. A. No. 00–2217(JWB) (D.N.J. June 28, 2001), Chief Judge John W. Bissell found that the IDEA "remed[ies] the denial of essential education services to a discrete class of individuals." *Id.*, slip op. at 21. Judge Bissell reviewed the IDEA, Rehabilitation Act and Americans with Disabilities Act and found the IDEA to be a remedial statute based on congressional findings which detected discriminatory practices in the public sector.[17] *Id.* at 21. Thus, Judge Bissell found that Congress had enacted the IDEA with the requisite congruence and proportionality under *City of Boerne* to constitute a valid abrogation of Eleventh Amendment immunity. *Id.* at 22–23. Likewise, in another case brought under the IDEA, my colleague, Judge Ka-

---

**17.** Congress enacted the Education for All Handicapped Children Act of 1975, the precursor of the IDEA, to remedy past discrimination against students with disabilities. *See* 20 U.S.C. § 1400(2). Congress found that prior to the enactment of these Acts:

(A) the special educational needs of children with disabilities were not being fully met;

(B) more than one-half of the children with disabilities in the United States did not receive appropriate educational services that would enable such children to have full equality of opportunity;

(C) 1,000,000 of the children with disabilities in the United States were excluded entirely from the public school system and did not go through the educational process with their peers;

(D) there were many children with disabilities throughout the United States participating in regular school programs whose disabilities prevented such children from having a successful educational experience because their disabilities were undetected; and

(E) because of the lack of adequate services within the public school system, families were often forced to find services outside the public school system, often at great distance from their residence and at their own expense.

20 U.S.C. § 1400(2) (2003). DOE and DDD contend that because the word "discrimination" does not appear in the IDEA, the statute exceeds the scope of Congress' Fourteenth Amendment powers. *See* DOE & DDD Br. in Supp. of Reargument, at 25. The above-quoted statutory language, however, points to ample evidence of past discrimination against students with disabilities.

tharine S. Hayden, relying on Judge Bissell's decision in *F.P.*, as well as the Third Circuit's decision in *Beth V.*, 87 F.3d at 88, held that the IDEA fell within the limitations of *Boerne*. *See* Bench Decision, *M.A. v. Newark Public Schs.*, Civ. No. 01–3389 (D.N.J. Feb. 6, 2002), Tr. at 19–20. I wholeheartedly agree with these decisions of my colleagues and reject DOE and DDD's challenge to the constitutionality of the IDEA.

### 3. Waiver of Immunity Through Acceptance of Funds

 The IDEA has been described as a model of "cooperative federalism" and authorizes federal funding for states providing the special education that the statute requires, with funding contingent on state compliance with the IDEA's array of substantive and procedural requirements. *See Beth V.* at 82. Recently, the Third Circuit held that conditioning the states' receipt of federal funds on their waiver of Eleventh Amendment immunity is not an unconstitutional restriction. *See Koslow*, 302 F.3d at 173–74.

The test for determining a State's waiver of its immunity is a stringent one, *see College Savings Bank*, 527 U.S. at 675, 119 S.Ct. 2219, which is a limitation that respects the states' sovereignty. Thus, if a state accepts federal funds for a specific department or agency, it voluntarily waives sovereign immunity for claims against that department or agency only. *See Koslow*, 302 F.3d at 171. In *Koslow*, the Third Circuit held that the Commonwealth of Pennsylvania, by accepting federal financial assistance under the State Criminal Alien Assistance Program and providing these funds to the Department of Corrections, waived immunity for Section 504 Rehabilitation Act claims against the Department of Corrections. *Id.* at 172; *see also F.P. & M.P*, Civ. A. No. 00–

2217(JWB), slip op. at 16 (citing *Jim C. v. United States*, 235 F.3d 1079 (8th Cir. 2000)) ("State of New Jersey, Department of Education ... has waived sovereign immunity for suits under § 504 by accepting federal funds for education programs."). Even though the Rehabilitation Act's amended abrogation language indicates that "[a] *State* shall not be immune under the Eleventh Amendment," 42 U.S.C. § 2000d–7(a)(1) (emphasis added), the Third Circuit limited abrogation to only those departments that actually received funds under the Act, not the State as a whole.

Consistent with the precedent set forth in *Koslow*, only those state departments that actually receive federal financial assistance under the IDEA waive their Eleventh Amendment immunity.

### 4. Whether DDD Has Waived Sovereign Immunity

As I noted in my previous opinion of August 7, 2002, the IDEA is not a well-drafted law and leaves many basic questions regarding the enforcement of the statute unanswered. *S.C.*, 213 F.Supp.2d at 454. I would also add that the intersection between the IDEA and state educational bureaucracies, such as New Jersey's, is one riddled with red lights and traffic jams. Once again, the road to providing a FAPE to all students with disabilities has met a roadblock, this time in the form of sovereign immunity.

Under *Koslow*, 302 F.3d 161, if DDD does not receive funding under the IDEA, it cannot waive Eleventh Amendment immunity under the statute.[18] Nothing in the record indicates that DDD receives federal financial assistance under the IDEA. New Jersey case law, in fact, indicates that the DDD does not. In *L.P. v.*

---

18. No party contests DOE's receipt of funds or liability under the IDEA.

*Edison Bd. of Educ.,* 265 N.J.Super. 266, 277, 626 A.2d 473, 479 (Law Div.1993) (Wolfson, J.), the court explained that "the obligation to provide a free and appropriate public education has been imposed exclusively on local boards of education through the DOE." *Id.* Because no interagency agreement exists between DOE and DDD, no IDEA funds have been directed to DDD, and, thus, DDD's immunity has not been waived. This creates a paradoxical situation—DDD, the state agency best suited to providing S.C. with his recommended residential educational placement[19], is immune under the Eleventh Amendment from a suit seeking the State's compliance with the IDEA.

Because the DDD does not receive IDEA funding, I shall dismiss it from this action on Eleventh Amendment grounds. My decision today does not alter DOE's obligation to S.C. under the IDEA. If the DOE would prefer to shoulder the burden of providing S.C. with a FAPE alone rather than pursuant to an interagency agreement with DDD, *see* 20 U.S.C. § 1412, so be it. As long as S.C. receives a FAPE as mandated by the IDEA, it does not matter which agency is footing Deptford's bill.[20]

### D. WHETHER AN IMMEDIATE APPEAL TO THE COURT OF APPEALS OR STAY IS WARRANTED IN THIS CASE

"The courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291 (West 2003). Under 28 U.S.C. § 1292(b), however:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

*Id.*

Because I have decided to grant summary judgment in favor of S.C., this action is appealable in the ordinary course and no immediate appeal under Section 1292(b) is necessary. I shall, likewise, decline DOE and DDD's request to stay these proceedings pending the outcome of an appeal.

### IV. CONCLUSION

For the reasons set forth above, I find that in order to receive a FAPE under the IDEA, S.C. should be placed in a residential educational program in accordance with ALJ Fidler's decision. Accordingly, I shall grant S.C.'s motion for summary judgment and deny Deptford's cross-motion for summary judgment. As for the Third–Party Defendants, DOE and DDD, I find that they have not presented any new facts, law, or evidence to support their motion for reargument. I shall, however, dismiss DDD from this action on the basis

---

**19.** DDD is obligated under New Jersey law to provide services, including "day care, domiciliary care, [and] special living arrangements" to "eligible developmentally disabled persons." N.J. Stat. Ann. § 30:6D–25(f) (West 2002).

**20.** The New Jersey State Legislature has recently voiced its discontent over the inadequate amount of federal funds that the State has received under the IDEA:

> The Legislature of the State of New Jersey urges the President and Congress of the United States to increase funding for special education under the [IDEA] so that the statutory goal of providing 40% of the national average per pupil expenditure will be achieved.

S. Con. Res. 74, 210th Sess. (N.J.2002).

of Eleventh Amendment immunity. Finally, I shall deny DOE and DDD's motions to stay the proceedings in this action and for certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The Court shall enter an appropriate form of Order.

## ORDER

This matter having come before the Court on the Cross–Motions of Defendant, Deptford Township Board of Education, and Plaintiff, S.C., a minor child, by his parents, C.C. and K.C., for Summary Judgment, pursuant to Fed.R.Civ.P. 56, and on the Motion of Third–Party Defendants, New Jersey Department of Education and New Jersey Department of Human Services, Division of Developmental Disabilities, for Reargument, pursuant to L. Civ. R. 7.1(g), Peter C. Harvey, Esq., Acting Attorney General of New Jersey, Michael Lombardi, Esq., Deputy Attorney General, appearing on behalf of the Third–Party Defendants; and James F. Schwerin, Esq., Parker, McCay & Criscuolo, P.A., appearing on behalf of Defendant and Third–Party Plaintiff, Deptford Township Board of Education; Herbert D. Hinkle, Esq., Law Offices of Herbert D. Hinkle, appearing on behalf of Plaintiff, S.C., a minor child, by his parents, C.C. and K.C.; and,

The Court having considered the submissions of the parties, for the reasons set forth in the Opinion entered concurrently with this Order, IT IS, on this 14th day of March, 2003, hereby ORDERED that:

1. The Motion of Plaintiff, S.C., a minor child, by his parents, C.C. and K.C., for Summary Judgement, pursuant to Fed. R.Civ.P. 56, is GRANTED; and,

2. The Motion of Defendant, Deptford Township Board of Education, for Summary Judgment, pursuant to Fed.R.Civ.P. 56 is DENIED; and,

3. The Motion of Third–Party Defendants, New Jersey Department of Education and New Jersey Department of Human Services, Division of Developmental Disabilities, for Reargument, pursuant to L. Civ. R. 7.1(g) is DENIED; and,

4. The Clerk of Court shall docket the Motion of Third–Party Defendants, New Jersey Department of Education and New Jersey Department of Human Services, Division of Developmental Disabilities, to Dismiss, pursuant to Fed.R.Civ.P. 12(b)(1).

5. Third–Party Defendant, New Jersey Department of Human Services, Division of Developmental Disabilities, is DISMISSED from this action on the basis of Eleventh Amendment immunity, pursuant to Fed.R.Civ.P. 12(b)(1); and,

6. The Motions of Third–Party Defendants, New Jersey Department of Education and New Jersey Department of Human Services, Division of Developmental Disabilities, for a stay of all proceedings in this action and certification of issues for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) to the United States Court of Appeals for the Third Circuit are DENIED.